1. The charge of the court on conspiracy was not erroneous because conspiracy was not charged in the indictment.
2. The evidence did not require a finding that the defendant acted under compulsion or intimidation, and the court did not err in failing to charge, without request, as contended in ground 5 of the amended motion for new trial.
3. There can be no robbery without an intent to steal, and the failure so to instruct the jury in this case is such error as to require the grant of a new trial.
4. The court erred in failing to charge the jury on the punishment for robbery by intimidation, and in so confusing the charge that the jury might have believed that the punishment for robbery by intimidation is the same as that for robbery by open force and violence.
 No. 16087. FEBRUARY 12, 1948.
Sammie Lee Nelson was indicted by the Grand Jury of Crisp County, the indictment charging that he "did then and there, unlawfully and with force and arms, wrongfully, fraudulently and violently, by open force and violence and by intimidation, take from the person of J. R. Meeks, without his consent and against his will a key ring and set of keys and one leather bill folder and Forty Dollars in lawful currency of the United States, the property of the said J. R. Meeks and of the value of Forty-Five Dollars."
J. R. Meeks, the Sheriff of Crisp County, was the only witness for the State on the trial of the case. The material part of his testimony was as follows: "On July 10, 1947, Sammie Lee Nelson and Tommie Reed were confined in the jail of this county under lawful warrants. . . About eight thirty at night . . I went up to the run-around where these men were. . . They were together in what is known as the run-around and there were *Page 331 
no other prisoners in there with them. I had turned them out of their cells that morning where they could walk around, and I went back to put them back in their cells for the night. I had been keeping them in individual cells at nighttime. When I got up there on this night, I was confronted with a nickel-plated pistol pointed at me with the hammer pulled back. This pistol was held by Tommie Reed, and as he pointed the pistol at me he said, `You all had me, now I got you, I want the keys — I am going to leave here.' I had the jail keys in my hand — they consisted of a set of keys on a ring — the keys to the jail. When he said that, I told him to come and get them. . . He said, `No, you throw the keys on the floor.' When I first got up there, this boy that had been in there a good many days, he usually goes right in the cell. I never had to tell him to go in there, I mean Sammie Lee Nelson. Well, I didn't throw the keys on the floor, and I looked to see, and this boy failed to go in the cell, and I didn't know whether he had one or not, as he had had a good bit of company in there. I threw the keys to the side then, and he said, `Pick them up,' and I had plenty of time to look and I knew it was a gun and I walked toward this boy and when I turned, Tommie Reed was about the same distance to this boy then and he was standing at my back and I stepped in the cell door, and when I stepped in there this Nelson boy pulled a lever down and shut the door while the negro stood there. That put me facing the two prisoners. Then Sammie Lee Nelson got a little closer, and this negro boy had his pistol and he told the other boy, Sammie Lee Nelson, to reach in and see if I had a pistol and he saw I didn't and he got my purse. Sammie Lee Nelson got my purse. Before that, the negro told him to see if I had a pistol, and Sammie Lee Nelson felt in my hip pocket. I was dressed then just as I am now, no coat — just in my shirt sleeves, and Nelson felt about my hip pocket, and the negro said something about searching me — Tommie Reed told him to feel and see what I had. Just before this I told Sammie Lee Nelson, I said, `You are going to make a big mistake if you leave with this negro,' and he didn't make any reply, and when he felt me, he said, `He has got nothing,' and Tommie Reed said, `Nothing at all?' and Sammie Lee said, `Nothing but a billfold,' and *Page 332 
Tommie Reed said, `You had better get that.' I never moved and he pulled that out; then they started out and he said. `We better do something about his hollering,' and I said, `I see no need to holler — nothing to holler about,' and then both of them made a dash and run out. They went out together. They locked me in the cell, Sammie Lee did that, and Sammie Lee Nelson is the one that searched me to see if I had a gun. Sammie Lee Nelson took the billfold from me, a tan leather billfold, with about forty dollars in lawful coin of the United States in it. . . The billfold was in my left hip pocket, and we were standing facing each other, and he reached around behind my back to get the billfold while the negro stood there with the pistol drawn on me. And while the negro kept me covered with that pistol, Sammie Lee Nelson searched me and took my pocketbook. The negro suggested that he take my pocketbook, and he did. . . At the time this happened, my automobile was parked between the jail and the courthouse; I heard them go down the steps and step in the car and drive off. I could see my automobile. I saw it leave but I could not see who was in it — I couldn't see them. The troopers broadcast this over their radio — I notified the State troopers what had happened, and Sammie Lee Nelson was finally located. Sheriff Hudson and myself found him in a closet down in Worth County. . . I had not located him from July 10, 1947, until last Tuesday or Wednesday — about a week. All the facts I have just related took place at the jail of Crisp County, Georgia, located in the City of Cordele, Crisp County, Georgia."
On cross-examination, Sheriff Meeks testified in part as follows: "I have known Sammie Lee Nelson only since I had him in jail; I would say around thirty days. . . I had had this negro Tommie Reed in jail — I put him in on Wednesday some time in the day and this happened Thursday night. There was no connection between locking up this boy Sammie Lee Nelson and locking up the negro Tommie Reed — that is, they were not connected with the same crime, and as far as I know they were strangers. If they entered into a conspiracy to rob me and escape, it was up there in the jail within a day and a half. . . I have not been able to locate the negro up to this time. . . With *Page 333 
reference to whether the negro appeared to be the head man in everything that was done, and this boy Sammie Lee Nelson aided and abetted and joined in — this boy stayed outside his cell before, he had to know it was going to start. He knew it was going to happen. Yes, sir, the negro was the one who pointed the pistol at me, and the negro was the one who told Sammie Lee Nelson to get my pocketbook, but he had a chance to go in his cell, which he usually did, and he didn't do that."
The material part of the defendant's statement was as follows: "They put him [Tommie Reed] up there on Wednesday before we got out on Thursday. He said they had him up there for something he didn't do. When they put him up there he had the pistol in his shirt pocket with a little tight sweater on and another jacket on top of it. He said he was going to get out on Wednesday, but the sheriff locked us up a little earlier than he had been locking us up, and then when the sheriff come to lock us up and the sheriff come in the door, he stuck the gun on him and I don't know what all he said to the sheriff. The sheriff dropped the keys at the door and he told him to come back and get in my cell. The sheriff got in my cell and I pushed the door to and locked it. He told me to search the sheriff to see if he had a gun, and I did and he didn't have a gun on him. He told me then to get his billfold and I didn't want to do that but I did anyway, and when we come down he come out the door first and he was the one that drove the sheriff's car off."
The jury returned a verdict of guilty with a recommendation of mercy, and the defendant was sentenced to life imprisonment. The motion for new trial, as amended, was overruled by the trial judge, and the exception is to this judgment.
1. Special ground 4 of the amended motion for new trial complains that the charge of the court, that "The State in this case contends that this defendant, acting conjunctively with Tommie Reed who was in the jail at the time, and acting in concert and in conspiracy with the negro, Tommie Reed, etc.," was prejudicial to him, in that the indictment did not *Page 334 
charge him with the offense of conspiracy or that he acted in concert and conjunctively with Tommie Reed, and because the evidence showed that Tommie Reed at all times had possession of the pistol and that he acted under the command and direction of Tommie Reed.
This charge was not erroneous, as contended, for the reason that the indictment did not expressly charge the defendant with conspiracy. Harris v. State, 188 Ga. 752 (4 S.E.2d 651);Johnson v. State, 188 Ga. 773 (4 S.E.2d 639). The defendant and Tommie Reed were jointly indicted, and the State was contending that the robbery was committed by the concerted action of both. There was sufficient evidence that the robbery was a joint criminal enterprise to authorize the court to submit this contention of the State to the jury.
2. Ground 5 insists that the evidence showed that everything that the defendant did in connection with the crime charged against him was under the direction of Tommie Reed, and that the court erred in failing to charge the jury that, if they "believed the defendant acted under the reasonable fears for his life, or bodily harm at the hands of Tommie Reed, and did not act freely and voluntarily, but under intimidation and duress from Tommie Reed, then he would not be guilty as charged in the indictment." No request was made for such a charge.
While the evidence in this case authorized the jury to find that in the robbery and escape the defendant acted mainly under the direction of Tommie Reed, neither the State's evidence nor the defendant's statement would require a conclusion that the defendant acted under compulsion or through intimidation, and it was not erroneous to fail to charge, without request, the principle of law set out in this ground.
3. Ground 6 shows that the defendant was indicted by the grand jury under the Code, § 26-2501, and it is contended that it was erroneous for the court to fail to charge that the jury could not convict the defendant under the indictment unless they believed beyond a reasonable doubt that the taking of the billfold containing $40 and the key ring, set out in the indictment, from J. R. Meeks was done with the intention on the part of the defendant to steal the articles named. It is pointed out *Page 335 
that the evidence shows that at the time these articles were removed by the defendant from the person of J. R. Meeks, Tommie Reed was holding a pistol on Meeks and that Reed directed and commanded the defendant to search Meeks and to take the billfold and key ring from him.
In Sledge v. State, 99 Ga. 685 (26 S.E.2d 756), it was held: "There can be no robbery without an intent to steal; and hence it is legally impossible for the trial judge to give to the jury correct instructions upon the trial of a robbery case which leave entirely out of view the question of felonious intent. It is not one of those collateral matters concerning which the court is only required to instruct the jury upon request, but it is of the very substance of the offense, and an omission so to instruct the jury would enable them to convict the accused without finding the felonious intent."
In Rutherford v. State, 183 Ga. 301 (188 S.E. 442), this court, in answering certified questions by the Court of Appeals, cited the Sledge case as authority for the statement that "an intent to steal is a substantive element in the commission of the offense of robbery," and that an instruction in the language of the Code is not a sufficient definition of the offense for the guidance of the jury. In the Rutherford case, the statement was made that, "Whether or not a failure to charge in specific terms regarding an intent to steal may be held `reversible error' will depend upon the circumstances of the particular case, including the issues developed by the evidence, and the defendant's statement, if any."
In the present case, the defendant contends that the omission in the charge was reversible error, while the State insists that, under the statement made in the Rutherford case, the failure was not reversible error.
In every case where a substantial right of a defendant has been denied him by the court's failure to charge, a new trial must be granted, unless it is apparent that the error was harmless to him. Under the circumstances of this case, it was a question solely for the jury's determination as to the intent of the defendant in complying with the instructions of Tommie Reed in taking the sheriff's keys and billfold. While, as pointed out in division 2, the circumstances were not such as to demand the conclusion, as *Page 336 
a matter of law, that the defendant acted under compulsion, yet the circumstances were such that the jury might have found that there was no intent on the part of the defendant to steal the billfold of the sheriff, since he had previously stated to Tommie Reed that the sheriff did not have anything on him, and it was only after further instruction on the part of Reed, who was armed with a pistol, that the defendant removed the billfold from the sheriff's pocket. In every case where from all of the evidence and the defendant's statement the finding would not be demanded that the defendant acted "with intent to steal," it is reversible error for the court to omit an instruction to the jury that, before the defendant can be convicted of the crime of robbery, it must appear that the property was taken with the intent to steal.
4. Ground 8 shows that the defendant was indicted for robbery "by open force and violence and by intimidation," and that the court properly instructed the jury on the punishment for robbery by open force and violence, and instructed them that they might find the defendant guilty of robbery by intimidation, but that nowhere in the charge did the court instruct the jury as to the punishment for robbery by intimidation. It is insisted that this was an expression of opinion to the jury that the court did not believe the defendant guilty of the offense of robbery by intimidation, and was prejudicial to the defendant.
Ground 9 assigns error on the charge on robbery by intimidation, wherein the court charged that the jury might find the defendant guilty of robbery by intimidation, but followed the instruction with a statement that, if they believed beyond a reasonable doubt that the defendant was guilty as alleged and charged by the State, they should set his punishment, and the punishment stated was that applicable to robbery by open force and violence, thus erroneously instructing the jury that the penalty for robbery by intimidation is the same as that for robbery by open force and violence.
Ground 7 may also be considered in connection with grounds 8 and 9, since ground 7, which is an elaboration of the general grounds, complains that the verdict of the jury, finding the defendant guilty of robbery of robbery by force and recommending mercy, was *Page 337 
contrary to law and the evidence, because the evidence does not show that the robbery, if committed by the defendant, was with force but, on the contrary, shows that it was committed by intimidation.
The definition of robbery in our Code, § 26-2501, is as follows: "Robbery is the wrongful, fraudulent, and violent taking of money, goods, or chattels from the person of another by force or intimidation, without the consent of the owner, or the sudden snatching, taking, or carrying away any money, goods, chattels, or anything of value from the owner or person in possession or control thereof without the consent of the owner or person in possession or control thereof." By the acts of 1937, pp. 490, 491 (Code, Ann. Supp., § 26-2502), robbery by open force or violence was made punishable "by death, unless the jury recommends mercy, in which event punishment shall be imprisonment in the penitentiary for life: Provided, however, the jury in all cases may recommend that the defendant be imprisoned in the penitentiary for not less than 4 years nor longer than 20 years, in the discretion of the court." The punishment for robbery by intimidation, or without using force and violence, is imprisonment and labor in the penitentiary for not less than 2 years nor more than 20 years. Code, § 26-2503.
Since the defendant was indicted under the first part of § 26-2501, robbery by sudden snatching is not involved in this case, although it may be noted that such offense was formerly larceny from the person and not robbery. Spencer v. State,106 Ga. 692 (32 S.E. 849). In 1903 the General Assembly amended the definition of robbery to include robbery by sudden snatching, so that under the present law the offense of robbery may be committed by three methods, that is, (1) by force, (2) by intimidation, and (3) by sudden snatching. See Hickey v.State, 125 Ga. 147 (53 S.E. 1026); Pride v. State,124 Ga. 792 (53 S.E. 192).
The former decisions of this court are not entirely without conflict as to the difference between robbery by force and robbery by intimidation. One of the most frequently cited cases is that of Long v. State, 12 Ga. 293. In that case, at page 315, the court stated: "When the Code speaks of force, it means actual *Page 338 
violence; and when it speaks of intimidation, it still means force; not actual and direct, but exerted upon the person robbed, by operating upon his fears — the fear of injury to his person, or property, or character. The law considers, however, that actual violence is attended with more immediate and serious consequences than violence by intimidation; and therefore it is, that a distinction is made in the punishment." At page 320, in the same case, the court defined force and intimidation as follows: "Force implies actual personal violence, a struggle and a personal outrage. If there is any injury done to the person, or if there is any struggle by the party to keep possession of the property before it is taken from him, there will be sufficient force or actual violence to constitute robbery. . . Intimidation . . . is constructive force. As force in our definition is the same with the violence of the common-law definition, so intimidation in ours, is synonymous with putting in fear in the common-law definition. Putting in fear is the meaning of intimidation. . . Robbery may be committed by putting one in fear of injury to the person, to property, or to character. . . Nor is it necessary that actual fear should be strictly and precisely proved, for the law in odium spoliatoris, will presume fear where there appears to be just ground for it."
There have been some cases in which a very small degree of force has been held to constitute robbery by force (for example, see Long v. State, 54 Ga. 564; Smith v. State,117 Ga. 320, 43 S.E. 736, 97 Am. St. R. 165; Moran v. State,125 Ga. 33, 53 S.E. 806), and at least one case in which it was held that the evidence supported a verdict of robbery by force, where there was no force used except the constructive force of intimidation (Clements v. State, 84 Ga. 660, 11 S.E. 505, 20 Am. St. R. 385). The fundamental principles quoted from the Long case have never been overruled, however, and are binding on this court.
In the present case, the evidence discloses that, while another person pointed a pistol at the sheriff, the defendant reached his hand in the sheriff's pocket and removed his billfold. Under the definition of "force" in Long v. State, supra, such taking by the defendant was not robbery by force. There was no personal violence employed, nor was there any struggle on the part of the *Page 339 
sheriff to retain his billfold; there was no injury to the person of the sheriff, nor any outrage of his person. As stated in theLong case, our Code definition of robbery accords with the common-law definition, and at common law robbery is larceny from the person accompanied by violence, or by putting in fear, and the indictment must therefore allege that the taking was by force, or by intimidation, putting in fear. To define the taking in this case as done with force and violence, when the only force used was that force necessary to remove the article taken from the sheriff's pocket, without any resistance on his part, would in effect mean that the taking of any property from the person would be robbery. Such construction is clearly unauthorized, since it would, by judicial interpretation, repeal the provisions of our Code (§§ 26-2601, 26-2628) defining larceny from the person.
If further consideration need be given to determine that the facts of this case do not make a case of robbery by force and violence, we have but to give consideration to our Code sections defining robbery and fixing the punishment. While the definition of robbery (§ 26-2501) is limited to "force or intimidation," the General Assembly declared that "robbery by open force or violence" should be punished by death or otherwise as provided in § 26-2501 (Code, Ann. Supp.). By the use of the word "open," the General Assembly provided that the force or violence should not be secret, hidden, or disguised, but the force or violence must be evident, existing and without concealment. See Webster's New International Dictionary (2d ed.), p. 1705. No such force or violence as fixed by the General Assembly is shown, and the State's case must rest on the charge of robbery by intimidation.
It was therefore error requiring the grant of a new trial for the court not to charge the jury as to the punishment for robbery by intimidation, and to so confuse the charge that the jury might have believed that the punishment for robbery by intimidation and robbery by force or violence is the same. Grant v. State,125 Ga. 259 (2) (54 S.E. 191).
Since, under the ruling in this division and in division 3, a new trial must be granted the defendant, it is unnecessary to discuss the general grounds of the motion for new trial, except as such grounds are discussed in this division. *Page 340 
 Judgment reversed. All the Justices concur, except Bell, J.,absent on account of illness, Atkinson, J., who dissents, andWyatt, J., who took no part in the consideration or decision ofthis case.
JENKINS, C. J., concurs in the judgment of reversal for the reasons stated in the first three divisions of the opinion.