## TRAXLER v. STATE.

No. A-11586. Dec. 10, 1952.

Rehearing Denied Jan. 7, 1953.

(251 P. 2d 815.)

Alan B. McPheron, Durant, J. S. Bracewell, Houston, Tex., and W. L. Steger, Durant, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., R. H. Mills, County Atty., and J. A. Shirley, Asst. County Atty., Bryan County, Durant, John L. Boland, Caddo, Lewis T. Martin, Denton Gossett and Louie Gossett, Durant, for defendant in error.

POWELL, J. Roy (Pete) Traxler, hereinafter referred to as defendant, was convicted in the district court of Bryan county, Oklahoma, where he was tried before a jury on a charge of robbery with firearms. The jury was authorized, Tit. 21 O.S. 1951 § 801, to inflict the death sentence, but his punishment was assessed at five years imprisonment in the State Penitentiary. This was the minimum penalty. The defendant being dissatisfied with the outcome would hazard much greater punishment by seeking a new trial. Appeal has accordingly been perfected to this court.

The defendant admits to taking the automobile of Frank Trimmer, a farmer of Bryan county, at gun point and forcing Trimmer and another to endanger their lives by flight with him from pursuing officers, but seeks escape from punishment on certain technical issues and a plea of subsequent reformation between the date of the act in 1937 and date of trial 1947.

A chronological history of the case is necessary for treatment of the specifications of error presented.

Under date of July 22, 1937, a complaint was filed in the justice of the peace court of W. D. Sparger, of Bryan county, sitting as an examining magistrate, charging the defendant with the crime of robbery with firearms. While this complaint was pending the Governor of Oklahoma granted the Governor of Texas a writ of extradition for the defendant's return to Texas. The prisoner was by reason thereof delivered to the Texas authorities to resume serving a life sentence in the Texas State Penitentiary, from which institution he was a fugitive when arrested on the above charge filed in Oklahoma.

Under date of August 12, 1946, the defendant having been brought into Bryan county, Oklahoma, by the sheriff of that county after extradition from Texas where he had remained after release from the penitentiary there, a new complaint was filed against him in the justice court of Lee Thompson, setting out the same charge as contained in the complaint first filed and mentioned above. The defendant was granted a change of venue on November 6, 1946, and the case was transferred to the justice court of C. A. Woodward, and a preliminary examination was had on December 5, 1946, and the defendant was bound over to the district court of Bryan county to answer the charge of robbery with firearms. The charging part of the information reads:

* * * that the above named defendant Roy (Pete) Traxler late of Bryan County, did in Bryan County, and in the State of Oklahoma, on or about the 21st day of July in the year of our Lord One Thousand Nine Hundred and Thirty-seven commit the crime of Robbery With Firearms in the manner and form as follows:

"That is to say, the defendant did in said County and State, at the date above named unlawfully, wrongfully, knowingly. wilfully and feloniously make an assault in and upon one Frank Trimmer with a certain firearm, a weapon, to wit: a certain pistol then and there had and held in the hands of the said Roy (Pete) Traxler, then and thereby putting the said Frank Trimmer in fear of an immediate injury to his life and person by threatening to shoot and kill the said Frank Trimmer and did then and there by means and use of said force, threats and putting in fear unlawfully, wrongfully, wilfully and feloniously, and against the will and without the consent of him, the said Frank Trimmer, take, steal and carry away from the possession of said Frank Trimmer certain personal property, to wit: A certain 1935 model Chevrolet Automobile, the personal property of and belonging to the said Frank Trimmer and of the value of $400.00, with the unlawful, wrongful and felonious intent then and there on the part of the said Roy (Pete) Traxler to rob and deprive the said Frank Trimmer of said property and to convert the same to the use and benefit of him, the said Roy (Pete) Traxler; * * *."

The defendant was first tried on the charge on the 14th day of April, 1947, but the jury being unable to agree, a mistrial was declared. The case was next tried on December 18, 1950, resulting as above.

For reversal of the conviction complained of, counsel for defendant present and urge eight specifications of error, which we shall treat in order as set out.

It is first contended that the Governor of Oklahoma "having unconditionally granted a writ of extradition to the authorities of Texas while a complaint of

robbery by firearms was pending against him in Oklahoma, could not thereafter reextradite him to the state of Oklahoma for the purpose of trying him upon a complaint alleging the same offense."

In this case it is not necessary to consider whether or not the Texas court might properly have refused to have honored the application for requisition on the theory that Traxler was not a fugitive by reason of the prior action of the Governor of this state in permitting the defendant's return to Texas. This is so for the simple reason that the defendant was actually returned to the State of Oklahoma for trial on the charge stated. We are faced with an accomplished fact. The defendant was in Oklahoma. The charge pending against him had never been disposed of.

In Jarrett v. State, 49 Okla. Cr. 162, 292 P. 888, we held that where an accused person is charged with an offense under the laws of this state and before trial a requisition is honored by the Governor of this State, and accused is taken to another state, this state has not lost jurisdiction to try him if thereafter he comes into the custody of this state. And in Ex parte Youstler, 40 Okla. Cr. 273, 368 P. 323, where the same principle was involved, we stated:

"Where a person is convicted in this state for a felony and appeals from such conviction, and pending such appeal is released by supersedeas, and while at liberty is delivered by the Governor of this state to a sister state by extradition proceedings, such delivery is a waiver of the jurisdiction of this state over the person and a waiver of the right of the state to demand the return of such person thereafter as a fugitive from justice. The honoring of the requisition does not satisfy the judgment, and, if thereafter such convicted person be brought or be apprehended within this state and jurisdiction of his person is acquired, he may be required to satisfy the judgment of conviction in this state. In such case this court, by habeas corpus, will not inquire into the manner by which jurisdiction of his person is obtained."

See, also, Adams v. Waters, 94 Okla. Cr. 428, 237 P. 2d 914, and Ex parte Hart, 95 Okla. Cr. 269, 244 P. 2d 859.

The act of the Governor of Oklahoma in honoring the requisition of the Governor of Texas did not operate to void the proceedings pending against the defendant in Bryan county at the time of such extradition, nor constitute a pardon for the acts involved. At most, where properly raised, it formed only the basis for a holding that such fact amounted to a waiver of the jurisdiction of this state to demand defendant's return to this state on account of being a fugitive. But as we have seen, it did not work out that way.

In a motion to dismiss the complaint filed against him the defendant at inception of proceedings asserted in said motion that at the time the Governor of Texas granted the requisition on October 15, 1946, there was an "agreement and understanding between the county attorney of Oklahoma and the Attorney General of Texas and defendant's attorney that the defendant would be afforded a reasonable opportunity to apply to the courts of the State of Texas for a writ of habeas corpus to test the validity of such detention, said hearing being on a Tuesday, and it was understood that defendant would be granted until Friday, in which to make and file such application." The motion then alleges some further dealings between the attorneys and the fact that on the 18th day of October, 1946, defendant was delivered by the sheriff of Denton county, Texas, to the officers of Bryan county, who then brought defendant into Oklahoma. It is therefore argued by defendant that when the Governor of Texas granted extradition the defendant had a "constitutional right of a reasonable time" in which to apply for writ of habeas corpus, and that such right was denied him through violation of a promise made to the Governor of Texas.

The record contains no evidence as to the correctness of the allegations of the motion, though the point raised was urged at all times in the trial court and is properly raised in this court. However, the truthfulness of the allegations would appear immaterial, as the general rule, and which seems applicable to the factual situation here, is stated in a note in 165 A.L.R., p. 948, where it is said that:

"It is virtually a universal rule of law that where a person accused of a crime is found within the territorial jurisdiction wherein he is so charged, and is held under process legally issued from a court of that jurisdiction, neither the jurisdiction of the court nor the right to put him on trial for the offense charged is impaired by the manner in which he was brought from another jurisdiction, whether by kidnapping, illegal arrest, abduction, or irregular extradition proceedings."

The basic principle supporting this general rule is that when a person accused of crime is held under valid process in the proper forum, such detention is not rendered invalid because of the illegality of the events which preceded, or which made the detention physically possible. His wrong against the state holding him is not to be condoned because of the illegality of the means employed in obtaining custody. The means used to bring him there will not be a subject of inquiry. Mathews v. State, 19 Okla. Cr. 153, 198 P. 112.

Counsel asserts that "the trial of Traxler 13 years after the alleged commission of the offense when delay was no fault of his constituted a denial of a speedy trial contrary to the constitution and laws of the State of Oklahoma and of the United States."

We are referred to a rule with reference to the right of an accused to a speedy trial as stated in 14 Am. Jur., p. 858, and in Vol. 118 A.L.R. 1037; and also cited are the cases of Glover v. State, 76 Okla. Cr. 53, 134 P. 2d 144, and Meadows v. State, 71 Okla. Cr. 353, 112 P. 2d 419. The rules in question and the cases are inapplicable because evolved from situations where the prisoner was confined in a prison of the same sovereign as that in which the other charges were pending, or where the accused though free on bond was unable to obtain a trial at one or more subsequent terms of court. More nearly analogous to the present case is a situation where a trial is delayed by reason of a prisoner being confined in a Federal prison. See annotation at p. 1046 of Vol. 118 A.L.R., and Thompson v. State, 96 Okla. Cr. 8, 247 P. 2d 535. In such cases the prevailing applicable rule appears to be that the state authorities are not guilty of laches by failure to bring the incarcerated accused to trial in that "it had been clearly established that the surrender of a Federal prisoner to a state for a trial in a state court on state charges rests entirely within the discretion of the United States, and that no state, as a matter of unqualified right, can insist or require that a federal prisoner be produced for trial before its tribunal." A.L.R. supra. And from what we have said before, by reason of the facts in this case the Governor of Texas possessed the right to have properly denied requisition even though the ground would have been technical and would not have absolved Traxler of the crime charged, if he should have thereafter come within the jurisdiction of this State.

It is argued under specification of error four that "the complaint should have been dismissed because the crime was alleged to have been committed nine years prior to the filing of the complaint and no facts were alleged showing the tolling of the statute of limitations."

In the case of Osborn v. State, 86 Okla. Cr. 259, 194 P. 2d 176, 178, this court in syllabus ten of the official report, stated:

"The statute of limitations does not ·negative a single element of the crime with which a defendant may be charged. It does not put in issue the guilt of the

defendant. It therefore is not necessary for the prosecution to prove that the defendant was not an inhabitant or usually resident within the state for a period of time which would have tolled the statute of limitations."

It is then specifically argued under specification five that this prosecution was barred by the statute of limitations. The applicable statutory provision is section 153 of Title 22 O.S. 1951, reading:

"If when the offense is committed the defendant be out of the State, the prosecution may be commenced within the term herein limited after his coming within the State, and no time during which the defendant is not an inhabitant of or usually resident within the State, is part of the limitation."

In the case of Davenport v. State, 20 Okla. Cr. 253, 202 P. 18, cited in the Osborn case, supra, this court states:

"It is well settled that, where the statute of limitations is relied upon for a defense in a criminal action, the burden is upon defendant to prove by a preponderance of the evidence any matter showing that the statute of limitations is not tolled."

The evidence is undisputed but that the defendant was actually outside the State of Oklahoma after the complaint in the within case was first filed in 1937 until the time he was finally incarcerated within this state to answer to the charge, he being confined in the Texas State Penitentiary, until his discharge in 1946, when he found employment at Denton in that state and remained there until extradited to this state. The question presented is whether under such facts this prosecution was barred by the three year statute of limitations. Section 152, Title 22 O.S. 1951.

Counsel contended that the defendant was at all times a resident of Oklahoma, his home being in Caddo county, and that the running of the statute was not tolled by his absence in Texas under the circumstances as in this case. It is asserted that the years spent in Texas cannot be considered as "time during which the defendant is not an inhabitant of or ususally resident within the State," as contemplated by the provisions of Tit. 22 O.S. 1951 § 153, quoted above.

It is stated by the Attorney General that "whether defendant's legal domicile remained in the State of Oklahoma during those years or in Texas is a matter not necessary to determine." He further asserts: "It is certainly true that he was not an inhabitant of or 'usually resident' within the state." Cited in support are the cases of People v. Carmen, 385 Ill. 23, 52 N.E. 2d 197, 198-200; State v. Snyder, 182 Mo. 462, 82 S.W. 12, and Jarrett v. State, 49 Okla. Cr. 162, 292 P. 888. We have studied these cases carefully and find them in point. In the first case the Illinois court said, in part [385 Ill. 23, 52 N.E. 2d 198]:

"In support of his position he [the defendant] cites many cases which hold that an involuntary removal does not operate to change a person's legal residence from the jurisdiction in which he had an established residence at the time of such removal. That this is the settled rule of law, no one will deny. The cases cited and relied upon are of no value here. They are not in point on the question here involved. The question in this case is not concerned with the legal residence of plaintiff in error. Hence, any reference to the cases cited would be wholly immaterial. All will agree with the rule which they announce, in a case where that rule is applicable The question here is, whether he was usually and publicly resident within this State during the time that he was confined in the penitentiary in Missouri, and during which time he was, at no time, within the State of Illinois. The mere statement of the question suggests the answer. In order to take the case out of the words of the statute, tolling the limitation, it is not sufficient that he might at all times have maintained an established and fixed legal residence within the State. It must appear further that he was usually and publicly resident within the State."

Following the above, the court proceeds to analyze the words "usually", "publicly" and "resident" as used in the statute. It is then stated:

"It is equally clear that he was not publicly resident within the State. His connection, if any, with the place which he now claims as his legal residence, was not open to the knowledge or general view of all. He was not generally seen, known or heard in or about that place. He was not there engaged in any activities which were carried on before the public. At no time, during the period here material, was he there at all. * * *"

It is concluded:

"* * * Notwithstanding the rule that involuntary imprisonment cannot change a man's legal residence, section 5 of division IV of the Criminal Code is not based on the legal residence of the defendant. It is based solely upon his absence from the State. * * *"

We have seen in the within case that while the defendant Traxler was confined in the Bryan County jail and while the charge of robbery with firearms was pending in justice court for preliminary hearing, defendant was extradited to Texas where he had been serving a life sentence. But in December, 1944, Traxler was ordered released from such life sentence upon a writ of habeas corpus. He was ordered retried. Ex parte Traxler, 147 Tex. Cr. R. 661, 184 S.W. 2d 286. He was never retried, and in 1946 released on bond. See Ex parte Traxler, 148 Tex. Cr. R. 550, 189 S.W. 2d 749. In August, 1946, defendant found employment in Denton, Texas. He did not return to his claimed home in Oklahoma. On August 12, 1946, a new complaint, as hereinbefore mentioned, was filed in Bryan County, identical to the one filed July 21, 1937.

In the Jarrett case, supra, this court said in the syllabus:

"1. Where an accused person is charged with an offense under the laws of this state and before trial a requisition is honored by the Governor of this state, and accused is taken to another state, this state has not lost jurisdiction to try him if thereafter he comes into the custody of this state.

"2. A prosecution for a public offense other than murder must be commenced within three years after its commission.

"3. A prosecution within the meaning of sections 2441 and 2442, Comp. St. 1921 [Tit. 22 O.S. 1951 §§ 151, 152], is 'commenced' at the time the preliminary complaint or information is filed with a magistrate in good faith and a warrant issued thereon. It is not essential that the warrant shall be served in order that the prosecution be commenced.

"4 When a prosecution for a public offense has been commenced by filing a preliminary complaint or information in good faith and a warrant is issued thereon, but the accused does not come into the custody of the state until after the expiration of the three year period, the state may proceed on the original preliminary complaint or may file another charging the identical offense."

It is our conclusion notwithstanding the rule that involuntary imprisonment cannot change a man's legal residence, that Tit. 22 O.S. 1951 § 153 is not based on the legal residence of the defendant. It is based solely upon his absence from the state.

It is our further conclusion that in the within case the state might, under the facts recited, have proceeded on the original preliminary complaint, but that it was not error where a new complaint charging the identical offense was filed.

By the sixth specification of error it is contended that:

"The Court should have appropriately instructed the jury upon the law of temporary taking as applied to robbery by firearms."

At this point a recitation of the actual incidents taking place at the scene of the robbery alleged, and following the same, as developed by the evidence and the statements of the defendant at trial, is necessary for the consideration of the correctness or incorrectness of the instructions given as well as of the instructions requested.

From the evidence of A. G. Beams, who was town peace officer of the town of Kingston, Marshall county, at the time of the events testified to, it was developed that he, a Mr. Risner (the sheriff of Bryan county), and Deputy Jim McLaughlin had received information that the defendant Traxler and a companion, reported as escapees from the Texas State Penitentiary at Huntsville, were in the vicinity. The officers commenced driving around looking for them, and eventually saw a car they decided was the Traxler car on a section line road near Kingston. They followed the car onto a dead-end road ending on the Washita river. When the Traxler car stopped the officers stopped their car. Traxler and his companion got out of their car and commenced firing at the officers, who returned the fire. Traxler was firing a rifle and his companion a six-shooter. No one was hit. Traxler and his companion went down a slight embankment into high grass and escaped. The officers found a woman, who gave her name as Mrs. Traxler and who proved to be the defendant's wife, in the car, and found ammunition in the front seat of the car. This was on July 20, 1937. The search for Traxler continued.

The evidence developed that thereafter, and on July 21, 1937, around 8:30 in the morning, Traxler and his companion Tindol who was subsequently killed, with a hostage, James E. Denton, a farmer whose car they had appropriated, appeared at the farm home of Frank Trimmer, the prosecuting witness, nine miles northeast of Durant in Bryan county seeking gasoline for their car. After leaving the Trimmer home they soon returned by foot, having run their car in a ditch, and proceeded to take the Trimmer car by brandishing a pistol, and threatened to take Mrs. Trimmer with them, and did take Mr. Trimmer.

Witness Trimmer testified: "A. Yes, he came back and said he was after my car."

"Q. After your car? A. Yes. Q. Now, when he first came up, what was said then? A. Well, I—he just walked up—right up to me and said they— Q. Was anything said about whether or not they got any gas? A. They said they run their car in the ditch or something and they came back after mine. Q. And what did you tell them, if anything? A. I told them I didn't think they would get it. Q. Then what happened? A. Well they stuck their guns in my side and said they expect they would. Q. Who stuck the guns in your side? A. Traxler and Tindol. Q. Did they get your car? A. Yes. Q. Those guns, now, were they short arms or were they long arms? A. They were short arms, pistols. Q. Now, what else was said there in reference to them taking anyone with them, if anything? A. Well, we—my wife asked them not to take me, to take the car and go on and not take me, and— Q. What was their response to that? A. Well, one· of them, Tindol said, 'we might just take her. She looks pretty good.' And Traxler said, 'No, we are loaded now.' * * * A. Well, I asked them when they got out to get a drink of water, I asked them at that time, told them we were in a strange country, and no telephones or no way of communication. I asked them to leave me out and take the car, all I asked of them was not to destroy it; that maybe I would get it back, and that I was a poor man, and was not able to buy another. Q. What was their response to that? A. They said, 'You must think we are damned fools.' * * * Q. Well, now, what was their attitude about letting you out? A. They didn't indicate that they intended to let me out at any time. Q. Did they ever tell you that they were going to let you out at any certain or given place? A. When they stopped over there, I asked them again, to take the car and leave me go, and they said no. 'No', Traxler said, 'We will let you out when we get across the river, but you won't talk.' And Tindol said, 'Dead men don't talk, you know.' "

Witness Trimmer testified additionally that at a stopping place where the robbers had momentarily dozed and he and Denton had seized their guns and Tindol had been killed and Traxler captured, that Traxler stated, "Well, my buddy will get you for this."

In an attempt to explain the taking of the Trimmer car, the defendant at trial had been asked by one of his attorneys, and answered as follows:

"Q. I will ask you whether or not you had any intention of appropriating and stealing Trimmer's car? A. No, sir, I didn't. Q. What was your intention about it, Pete? A. Oh, I just wanted to get away. I was trying to get away from the officers, and I just wanted to get a little further on down the road. I had no intentions of taking his car and depriving him of it, keeping it, selling it, burning or destroying it otherwise. I had only one intention, and that was to get away, if I could."

An important point to keep in mind is that nowhere in the evidence of defendant do we find an explicit or categorical denial of the truthfulness of the testimony of the prosecuting witness as to factual matters with reference to the taking and use of the automobile as well as the intentions expressed at the time by the robbers.

The appellant submitted on the subject of robbery the following requested instructions:

"Defendant's requested Instruction No. 1.

"You are instructed that the essential elements of the crime in this information are: * * * 4th. The taking of said property must have been with a felonious intent to deprive the owner thereof permanently and to convert the same to the use and benefit of the taker. * * *"

Defendant's requested Instruction No. 5:

"You are instructed that before you could find the defendant guilty of robbery, as set forth in the information, you must believe from the evidence, beyond a reasonable doubt, that [at] the time of the taking, if the defendant did take the automobile as alleged, he had the intention of permanently appropriating the same to his own use and benefit.

"If the defendant took the car, but at the time of the taking had the intention of using the same temporarily for the purpose of effecting his escape, or if he intended to use the same for a time and then abandon it, to be repossessed by the owner, then you will find the defendant 'not guilty.' "

Pertinent to the question raised must be considered the following instructions actually given by the court:

"No. 3. You are instructed that [See Secs. 791 to 797 of Tit. 21 O.S.A. 1951, quoted below] robbery is defined to be the wrongful taking of personal property in the possession of another from his person or immediate presence, and against his will, accomplished by means of force or fear. To constitute robbery the force or fear must be employed to obtain or retain possession of the property, or to prevent or overcome resistance to the taking. The fear which constitutes robbery may be either: first, the fear of an unlawful injury, immediate or future to the person or property of the person robbed; second, the fear of an immediate or unlawful injury to the person or property of anyone in the company of the person robbed, at the time of the robbery.

"No. 4 You are instructed that the particular statute under which this charge is prosecuted reads as follows: [See § 801 of Tit. 21 O.S.A. 1951, quoted below, and which is quoted verbatim to complete instruction No. 4]."

"No. 5. You are instructed that the value of the personal property, automobile, alleged to have been taken from the said Frank Trimmer by the defend-

ant Roy (Pete) Traxler at the time of the alleged commission of the offense is immaterial.

"No. 6. You are therefore instructed that if you believe and find from the evidence in this case beyond a reasonable doubt that on or about the date charged in the Information, or at any time prior to the date of the filing of the Information herein, which was on the 6th day of December, 1946, or within 3 years of when he was returned to this State,—in Bryan County, State of Oklahoma, the defendant Roy (Pete) Traxler did with the use of firearm, to wit: a pistol, rob one Frank Trimmer of certain personal property, to wit: the automobile described in the information, by taking the same out of the possession of or immediate presence of the said Frank Trimmer and against his will, by putting in fear the said Frank Trimmer by use of such firearm, then you will find the defendant guilty of the crime of robbery with firearms as charged in the Information, and fix his punishment therefor.

"On the other hand, if you do not believe the defendant guilty beyond a reasonable doubt of such offense, or if you have a reasonable doubt of his guilt, then you will acquit the defendant."

"No. 12. You are further instructed that whenever two or more persons, acting together, commit a robbery, each of such persons is equally guilty of such robbery just as though each of such persons had committed the robbery independently of the other person. If you find beyond a reasonable doubt that Roy (Pete) Traxler and Fred Tindol *went to Mr. Trimmer's house with the intention of robbing Mr. Trimmer of his car* [and did rob him of said motor vehicle] *and that both acted together in robbing Mr. Trimmer of his automobile,* then each of them is guilty of robbery regardless of which one of them took the most active part in [committing said robbery] the robbery. (Italics supplied.) (Suggested improvements in brackets.)

The information, heretofore in material part quoted, was based on § 801 of Tit. 21 O.S.A. 1951 (given as Instruction No. 4, as above indicated) which reads as follows:

"§ 801. Any person or persons who, with the use of any firearms or any other dangerous weapons, attempts to rob or robs any person or persons, or who robs or attempts to rob any place of business, residence or banking institution or any other place inhabited or attended by any person or persons at any time, either day or night, shall be guilty of a felony, and, upon conviction therefor, shall suffer punishment by death, or imprisonment, at hard labor, in the State Penitentiary, for a period of time of not less than five years, at the discretion of the Court, or the jury trying the same."

The quoted instructions given, except No. 4, have been held to be definitive in nature, while Section 801, under which the information was filed and on which instruction No. 4 was based, has been held a statute of classification and not of definition. Woods v. State, 68 Okla. Cr. 406, 99 P. 2d 189; Simpson v. State, 40 Okla. Cr. 58, 266 P. 783.

Our statutory provisions covering robbery, (and on which all the instructions given were based, as indicated) may be found in Tit. 21 O.S. 1951 §§ 791-801, as heretofore stated, and we quote:

"§ 791. Robbery is a *wrongful taking* of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear. (Italics supplied.)

"§ 792. To constitute robbery, the force or fear must be employed either to obtain or retain possession of the property, or to prevent or overcome resistance to the taking. If employed merely as a means of escape[1], it does not constitute robbery.

---

[1] An example of the meaning of this provision is found is Kernell v. State, 53 Okla. Cr. 259, 10 P. 2d 287, and a reading of that case will demonstrate the inapplicability of the rule to the situation in the within case.

"§ 793. When force is employed in either of the ways specified in the last section, the degree of force employed is immaterial.

"§ 794. The fear which constitutes robbery may be either:

"1. The fear of an unlawful injury, immediate or future, to the person or property of the person robbed or of any relative of his, or member of his family; or,

"2. The fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed, at the time of the robbery.

"§ 795. When property is taken under the circumstances, required to constitute robbery, the fact that the property was of trifling value does not qualify the offense.

"§ 796. The taking of property from the person of another is not robbery, when it clearly appears that the taking was fully completed without his knowledge.

"§ 797. Robbery, when accomplished by the use of force, or of putting the person robbed in fear of some immediate injury to his person, is robbery in the first degree. When accomplished in any other manner, it is robbery in the second degree."

Sections 798 and 799 have to do with the punishment for robbery in the first and second degrees, and paragraph 800 covers robbery by two or more persons.

In treatment of the specification of error here urged, the appellant devotes only about three brief paragraphs, in contrast to the state devoting the major portion of its brief to the subject, but accused does tabulate citations that, leading from one to another, have confronted us with a galaxy of cases of varied application and thought, because theft and robbery came about as the earliest manifestations of the greed and sin of mankind. What makes the problem involved and has required so much research and concern has been the fact that, as pointed out by the Attorney General, this court in some early cases made the mistake of citing and applying decisions from other states and statements from text-books without apparent investigation of the statutes upon which those decisions were based. It would seem that the unique wording of our statute defining robbery as compared to that of sister states has not been examined nor considered.[2] We have done considerable research, having examined the statutory provisions of every other sister state, as well as many of their decisions, bearing on the crime of robbery.[3]

Advertising to the code definition of robbery in Georgia, we do notice from the volume of the Code examined that the crime of robbery is listed under the division of offenses against property, rather than offenses against the person. This is so in many of our other sister states, but in Oklahoma our statutes, heretofore quoted, classify robbery as a crime against the person while larceny is classified as a crime against property. See Neufield v. United States, 73 App. D.C. 1074, 118 F. 2d 375, 388. Also to be noted, in Oklahoma there is a recognition of a difference in the enormity of the crime of robbery, (against the person) which, where a dangerous weapon or a firearm is used, carries a penalty of death

---

2 See Johnson v. State, 24 Okla. Cr. 326, 218 P. 179, where common law definition of robbery approved.

3 (a) Eleven states have no statute defining robbery; the common law definition is applied, and being stated in 46 Am. Jur., p. 139, as "the felonious taking of money or goods of value from the person of another or in his presence, against his will, by force or putting in fear." (Italics supplied.)

(b) Nineteen states use the phrase "felonious taking" in statutory definition.

(c) The remainder of the states use the phrase "unlawful taking" or "taking by force and violence", etc.

(d) Oklahoma and South Dakota use the phrase "wrongful taking", and Georgia has a definition, though quite different, merits studious comparison with Oklahoma and South Dakota, as quoted hereinafter.

down to not less than five years at hard labor in the penitentiary. And robbery not involving dangerous weapons, and in the first degree, provides for not less than ten years with possible maximum of life, with robbery in the second degree punishable not exceeding ten years in the penitentiary. Tit. 21 O.S. 1951 §§ 798-799. On the other hand, the maximum penalty for grand larceny (where hundreds of thousands of dollars might be stolen) is not exceeding five years, while larceny of motor vehicles ranges from three to twenty years. Tit. 21 O.S. 1951 §§ 1701-1725. It is therefore at once apparent that the great difference in punishment prescribed must be accounted for in the case of robbery and particularly in the case of robbery by means of firearms or other dangerous weapon, by reason of the great 'likelihood and chance of injury or death to the person thus robbed and perhaps by reason of the suffering of affront to human dignity and the violation of civilized standards, which has come more forcibly to notice as civilization has advanced. This might be an instance where concern has been manifested in favor of and an attempt made to safeguard human rights by a preference over property rights. For the value of the personalty taken in robbery is of no significance.

As also pointed out by the state, in nearly all of the states which have adopted statutory definitions of robbery, they have merely adopted in statutory form the definition as it existed at common law (and from our research it appears that even for most part the states with varying definitions have embraced in full the pronouncements of the courts of states with the common law definition of robbery) and define robbery as the "felonious" taking of property; and the courts, as we have seen, have held that such term involves the intent to steal and to deprive the owner permanently of the property. But it has usually been held that robbery is compound larceny, an aggravated form of larceny and, therefore, involves all of the elements of the crime. And it has been held that larceny is a "necessary ingredient of the crime of robbery", a degree of the offense of robbery and that it is an included offense and that a conviction for larceny may be had under a charge of robbery. State v. Dunn, 66 Kan. 483, 71 P. 811; State v. Pace, 174 La. 295, 140 So. 482, 484; State v. McDonald, 89 N.J.L. 421, 99 A. 128, 129; Elam v. Commonwealth, 273 Ky. 414, 116 S.W. 2d 981; Southerland v. Commonwealth, 217 Ky. 94, 288 S.W. 1051, 1053.

Our attention has particularly been directed to the fact that in this state, however, this court has expressly held that larceny is not an included offense, and that upon a charge of robbery the defendants may not be convicted of larceny from the person. Marks v. State, 69 Okla. Cr. 330, 102 P. 2d 955, 959.

We conclude that these matters must receive serious consideration in the interpretation of our statutory provisions and receive compelling attention in our arriving at a final conclusion on the subject; and that also important in such examination is the fact that the rule in this state is that while the definition of an act made an offense by statute but not defined by it (as in the case as to some provisions of the larceny statute, as shown in case hereinafter cited) may be ascertained by reference to the common law, Tit. 22 O.S. 1951 § 9. Sneed v. State, 61 Okla. Cr. 96, 65 P. 2d 1245, that by statute there are no common-law crimes in Oklahoma. The truth is that in this jurisdiction, no act is a crime unless made so by statute, and where the crime is defined by statute such definition must be relied on rather than the common law or some other definition of the act so classified as a crime. Tit. 21 O.S. 1951 § 2. The circumstance that the definition differs from the majority definition, standing alone, can make no difference, as this court is bound by the solemn act of our Legislature where such act is within the constitutional prerogative and validly enacted. We are not, it would seem, at liberty to ascribe to a word a meaning contrary to the well known, usual and ordinary meaning, though, of course we recognize the principle that the meaning

of a word may be enlarged by the words used in connection with it, and this court has said that "a primary rule of construction is that the intention of the Legislature is to be found * * *in the ordinary meaning of the words of the statute, construed in view of the connection in which they are used, and of the evil to be remedied." Couch v. State, 71 Okla. Cr. 223, 110 P. 2d 613, 616; State v. Sandfer, 93 Okla. Cr. 228, 226 P. 2d 438; Board of Commissioners of Kingfisher County v. Grimes, 75 Okla. 219, 182 P. 897.

We can conceive of circumstances and are aware of instances where the meaning of the word "wrongful" was expanded in connection with which used so as to include "felonious". See Hasson Grocery Co. v. Cook, 196 Miss. 452, 17 So. 2d 791. But ordinarily the words "wrongful" and "felonious" are not synonymous or equivalent to each other or convertible terms. See any dictionary. The Supreme Court of Indiana so held as to the words "wrongfully" and "unlawfully" in Louisville, E. & St. L .Ry. Co. v. Payne, 103 Ind. 183, 2 N.E. 582, 584. That principle is of interest.

South Dakota (that has, as stated, a statute, SDC 13.2601, defining robbery as our Oklahoma provision) has a statute like ours defining *extortion* as "the obtaining of property from another with his consent induced by a wrongful use of force or fear". SDC 13.3901. The word *wrongful* has been defined by the Supreme Court of that State in construing the extortion statute. In In re Sherin, 27 S.D. 232, 130 N.W. 761, 40 L.R.A., N.S. 801, Ann. Cas. 1913D, 446, it was held:

"The word 'wrongful,' as used in section 633, relates solely to the method used; and a person may be guilty of extortion under such sections if he obtains money from another by unlawful means, though he does not seek to obtain any benefit for himself, and believes that the money or property obtained in fact belongs to the person for whom it is obtained; the term 'extortion' being construed to mean 'to obtain from a holder desired possessions or knowledge by force or compulsion; to wrest from another by force, menace, duress,' etc."

The gist and effect of defendant's argument is that the common law definition of robbery applies in this state, and further that the principles applicable in larceny cases apply to robbery as robbery is nothing more than larceny by force or fear from the person.[4] Accused cites, therefore, two larceny cases from this jurisdiction, and being Saferite v. State,[5] 67 Okla. Cr. 229, 93 P. 2d 762, and Hughes v. State, 61 Okla. Cr. 40, 65 P. 2d 544. These cases, of course, involve the interpretation of an entirely different statute, Tit. 21 O.S. 1951 §§ 1701-1725, from that of robbery as defined by our statutes, heretofore quoted. The prin-

---

[4] Of interest on this point see People v. Levan, 1945, 295 N. Y. 26, 64 N. E. 2d 341; and Nelson v. State, 203 Ga. 330, 46 S. E. 2d 488.

[5] While the principle of law set out in the Saferite and Hughes cases with reference to larceny is in accordance with the uniform expressions of this court to the effect that larceny involves proof of an intent to permanently deprive the owner of the property taken, we are inclined to agree with the Attorney General, who points out that in the Saferite case it would appear that we have a glaring example of an improper application of the law to the facts recited, because the author of the opinion substituted this court for the jury as a trier of the facts and the conviction was actually reversed on the facts, rather than law.

The evidence developed that the prosecuting witness had driven to Barnsdall in the evening and had conveniently parked his car while he was attending a lodge meeting. Saferite and an accomplice saw the car owner leave the car and on discovering that the key had been left in it, proceeded to immediately take possession of the car and departed with it for Bartlesville. The owner of the car could not locate his vehicle until the following day when with the assistance of the officers it was located wrecked near Bartlesville. Saferite and his co-defendant were apprehended and charged with larceny of an automobile, and the defense interposed was that the defendants had only taken the car to go to Bartlesville to see the wife of Saferite. They claimed that after attending a dance they started back to Barnsdall and had the accident with the car. They disclaimed any intent to permanently deprive the owner of his car, though they did wreck it. From the facts proven it was held that the State as a matter of law had not made out a case and the case appealed was remanded and ordered dismissed.

Further cases involving larceny are cited, one of interest being Carroll v. State, 50 Tex. Cr. R. 485, 98 S. W. 859, 123 Am. St. Rep. 851, 14 Ann. Cas. 426, where accused admittedly stole a horse to escape pursuing officers. And see 32 Am. Jur. 930-1 and 52 C. J. S., Larceny, § 150, p. 999, cited by appellant.

ciple evolved from these two cases that accused seeks to have applied to the within case is stated in paragraph one of the syllabus in the Saferite case, as follows:

"Any taking of personal property with the intent to temporarily deprive the owner thereof, and then to return the same, does not constitute larceny, but is a trespass. In order to constitute a felonious intent, *the taking must be to permanently* deprive the owner of the property."[6] (Italics supplied.)

Defendant does cite several Texas cases that are clearly in point in supporting his position here advanced.[7] In Galloway v. State, 126 Tex. Cr. R. 294, 71 S.W. 2d 871, the evidence developed that the defendant in that case and another drove up behind the prosecuting witness, posed as officers and at gun point took his automobile and its load of beer and later put the prosecuting witness out on the highway, after he advised the driver that he recognized the robbers and knew that they were not officers. Later officers found the car abandoned and with the key in the switch, but the contents of the car had been removed. The conviction was reversed because the court held: "In prosecution for robbery by taking of automobile, refusal to charge that, if automobile was appropriated only temporarily for the sake of the beer in it, defendant was not guilty, held error under the evidence."

The State in the within case calls our attention to the late case of Woods v. State, 1949, 153 Tex. Cr. R. 457, 220 S.W. 2d 644, which held:

"Defendant who took billfold from salesman at point of loaded gun and kept it for several hours while driving automobile stolen from salesman, and who finally abandoned automobile with billfold without removing contents, was guilty of robbery by assault."

We note that the Woods case quotes from Brown v. State, 61 Tex, Cr. R. 334, 136 S.W. 265, 266, where the court said:

"Whenever a party is held up, and put in fear of his life by having a gun presented at him * * * and the party with the gun takes charge of the property, the offense of robbery is complete."

Also quoted with approval is Aughton v. State, 149 Tex. Cr. R. 504, 196 S.W. 2d 642, 643, where the court said:

"Robbery is but an aggravated species of theft. It was not necessary to show that he carried the property away in order to complete the offense. If he reduced the property to his possession, although he later abandoned it, the offense would nevertheless be complete. * * * The offense of robbery is complete when property is taken into possession as the result of an assault and with the intent to appropriate."

And while we are heartily in accord with the above principle of law from the Woods, Brown and Aughton cases, we discover, however, that in the Aughton case so quoted with approval in the Woods case that a rehearing was granted on

---

6 While even in larceny where ordinarily it is held that the intention is the essence of the crime (17 R. C. L., p. 24) there are exceptions, where, for example, a statute may declare the commission of a certain act to be larceny without regard to the intent, as where it thus designates the conversion of state funds by one having possession thereof to his own use. State v. Ross, 55 Or. 450, 104 P. 596, 106 P. 1022, 42 L.R.A., N.S., 601 and note.

In State v. Cochrane, 51 Idaho 521, 6 P. 2d 489, 492, it is said: "Since the statute (C.S. § 8191) does not provide that criminal or fraudulent intent is an element of the crime of grand larceny therein denounced, it was not necessary for the information to allege, or the state to prove, such an intent in order to sustain a conviction in the case at bar."

7 In favor of defendant's contention we find an interesting and fairly late Alabama case of Root v. State, 247 Ala. 514, 25 So. 2d 182, citing Kennedy v. State, 208 Ala. 66, 93 So. 822. Without doubt the Supreme Court of Alabama is committed to the rule that if the accused takes at gun point an automobile merely to escape officers, that the taking could not be robbery unless there was intent to permanently deprive the owner; that the question of intent to steal must under all circumstances be submitted to the jury.

the strength of the holding in the Galloway case, supra, and it was in the Aughton case on rehearing held error not to have permitted the jury (even though the evidence also showed a taking in that case of a pocketbook by force of firearms) to determine the question of whether or not the taking was to permanently deprive the victim of the property in view of the later abandonment. And while the Woods case is a later case than the Aughton, we are unable in view of the similarity of the facts developed in each case, to give weight to it as favoring the position of the Attorney General. This case does not purport to have overruled the Galloway case.

We would get on with the problem by now reviewing the contentions of the Attorney General. He contends that the question under consideration must be decided from a consideration of the very wording of the statute adopted by our Legislature and not from the interpretation of other courts of statutes with different wording. This presents a problem from the simple fact that our statutory definition of robbery seems to be different in a particular and material respect from that of every state in the Union except South Dakota, and both Oklahoma and South Dakota adopted their statute defining robbery from Dakota Territory, Comp. Laws Dakota 1887, § 6481. There is strong evidence that the statute may have been originally worded by the great David Dudley Field[8] or at least by his committee that sought to prepare and have enacted a code of laws, both civil and criminal, for the State of New York, and which was adopted in great part by Dakota Terirtory.[9] And from time to time in modified form by many of the states of the Union. And from the quality of the work of Field and his committee and the Dakota Committee, we prefer to believe (although this is not the easy way out and will get us in deep water), that it was not by inadvertence or scant consideration or by omission that the wording of the statute defining robbery was as enacted in Dakota Territory and as finally adpoted by our Legislature, and heretofore quoted.

We find, as asserted by the State, no robbery case in South Dakota in which the statute has been construed. Originally, however, the statutes of North Dakota contained the same definition of robbery as our own statute, and in the case of State v. Fordham, 13 N.D. 494, 101 N.W. 888 decided in 1904, at a time when such original definition was in force, the Supreme Court of North Dakota in spite of the difference in the wording construed the statute in harmony with the rule prevailing in the other states where the words "felonious taking" are used in the statute (in the place of the words "wrongful taking" as actually used at the time in the Dakota statute) and held the words "wrongful taking" to be synonymous with "felonious taking", which is contrary to comparative definitions in any dictionary that we have examined, lay or legal, or of simple reasoning. We discover that in 1904 the Code Commission of North Dakota revised their statute on robbery to use the word "felonious" instead of "wrongful" as originally phrased. So, aparently there must have been doubt as to the construction placed on the statute by the court (as to the statute as originally worded), in State v. Fordham, supra, and hence the revision to conform to reason.

---

8 A very interesting article concerning the activities of David Dudley Field in his efforts to codify the laws, both substantive and adjective, civil and criminal, and his efforts in behalf of the American Bar is contained in an article in Vol. XVII, Report of the American Bar Association of 1894. See also article in Dictionary of American Biography, Vol. VI, Echols and Frazer, Scribners.

9 See the Revised Codes of Territory of Dakota, A.D. 1877, p. V of Preface, reading, in part: "The Code of Criminal Procedure had its origin in New York, and it was revised and adopted in California. It was enacted in substantially its present form, but abridged on certain subjects, by the eleventh session of the Assembly supplying the parts before omitted, and the whole code is thus revised according to the latest and best examples of legislation in the most enlightened states. * * *

"The Revised Codes, as now enacted and printed, save a very few and unimportant blemishes, are believed to embrace the best results of legislation in this country, and also to express the weight of the latest and most enlightened judicial learning and judgment. In them the territory, or the future state, has an invaluable public heritage which should be changed only with intelligent conversation and the general integrity of which should be preserved with conscientious fidelity."

We find, as heretofore in footnote indicated, that Georgia has a statute, Code § 26-2501, comparable to the Oklahoma and South Dakota statutes which seems not only to be a statute of definition but by reason of wording and of cases construing it, also of classification. It reads:

"§ 26-2501. Robbery is the wrongful, fraudulent, and violent taking of money, goods, or chattels from the person of another by force or intimidation, without the consent of the owner, or the sudden snatching, taking, or carrying away any money, goods, chattels, or anything of value from the owner or person in possession or control thereof without the consent of the owner or person in possession or control thereof."

We find that in construing the above statute it was in the case of Rutherford v. State, 1936, 183 Ga. 301, 188 S.E. 442 held:

"Indictment in robbery prosecution charging offense in language of statute is not demurrable for failure to allege that taking was with intent to steal, since word 'fraudulent' as used in statute implies intent to steal (Code 1933, §§ 26-2501, 27-701)."

But in spite of the court's conclusion that an indictment in the language of the statute, heretofore quoted, was sufficient to withstand a demurrer thereto, the court in the same case further held:

"In robbery prosecution, charge defining robbery in language of statute without stating that taking must be with intent to steal is insufficient, although whether failure to so charge constitutes reversible error, depends on circumstances of particular case."

The court pointed out that the circumstances would be the issues developed by the evidence, and the defendant's statement, if any.

We must go back to the early case of Sledge v. State, 1896, 99 Ga. 684, 26 S.E. 756, where we find a fuller exposition on the subject to get an inkling into the process of interpolation or reading into the statute words not therein contained, whereby the court ended up in spite of its statutory definition, with the common law definition of robbery, pure and simple. Said the court:

"The definition of robbery, as expressed in section 151 of the Penal Code, [26-2501] is inaccurate for want of fullness. It omits the felonious intent as a constituent element of the offense. The animus furandi is as much involved in the commission of a robbery as in the commission of a larceny. It is as necessary to be alleged and proven in the one case as in the other. There can be no robbery without an intent to steal, and hence it is legally impossible for the trial judge to give to the jury correct instructions upon the trial of a robbery case which leaves entirely out of view the question of felonious intent. It is not one of those collateral matters concerning which the court is only required to instruct the jury upon request, but it is of the very substance of the offense, and an omission so to instruct the jury would enable them to convict the accused without finding the felonious intent. This court has repeatedly ruled that upon that class of questions the trial judge should instruct the jury without request."

A late and well considered case where the definition of robbery is involved is that of Moyers v. State, 1938, 186 Ga. 446, 197 S. E. 846, 116 A.L.R. 981, where Justice Graham, a highly regarded jurist, wrote the opinion. We gather that by reason of the long line of precedent there is no doubt but that the common law definition of robbery prevails in Georgia; that if the "animus furandi" is lacking in the taking, there can be no robbery.

We find that in the State of Minnesota its statute defining robbery is very similar to our statute, except the term "unlawful" is used where we use "wrongful". In State v. Bruno, 141 Minn. 56, 169 N.W. 249, 250, the Supreme Court of Minnesota in construing its robbery statute had for consideration a case where

the evidence developed that the accused had bludgeoned his victim and removed money from his person. The jury was instructed that if they believed this evidence false they must acquit. Said the court, in the body of the opinion:

"It is said the court should have charged that intent to steal was an essential element of the crime. Criminal intent is not necessarily an element of a crime defined by statute. State v. Quackenbush, 98 Minn. 515, 108 N.W. 953; State v. Sharp, 121 Minn, 381, 141 N.W. 526; State v. Damuth, 135 Minn. 76, 160 N.W. 196. The statute does not in terms make intent a necessary element in the crime of robbery. Whether intent is ever an issue on a trial for robbery we need not determine. If the acts charged by the state were committed, there could be no issue of intent in this case. Such acts necessarily constitute robbery."

We find no further Minnesota cases on the point above stated.

While the Supreme Court of Missouri has held that in robbery the taking must be with intent to steal, State v. O'Conner, 105 Mo. 121, 16 S.W. 510, the opinion of that court in State v. Smith, Mo. Sup., 68 S.W. 2d 696, 698, is of interest, and would seem to refute the idea that animo furandi is involved in the definition of the word "steal". Or if involved, that the question must necesssarily be submitted to the jury. It is said in part:

"The appellants' last assignment of error does not sustain the charge of first degree robbery by the use of a deadly and dangerous weapon, 'but if the evidence showed anything at all, it only showed and it at most tended to show that defendants got into said automobile, if they in fact did, for the sole purpose of escaping jail, and not for the purpose of stealing said automobile by permanently depriving the owner thereof.'

"What we have said in the preceding paragraph shows that the evidence was sufficent to constitute robbery in the first degree by the use of a dangerous and deadly weapon, as this crime is defined by sections 4058 and 4061 R.S. 1929 (Mo. St. Ann. §§ 4058, 4061, pp. 2856, 2863).

"It is the 'taking the property of another from his person, or in his presence, and against his will, by violence to his person, or by putting him in fear of some immediate injury to his person' that constitutes robbery in the first degree. (Section 4058, supra.) We think the taking of the automobile was done with the intention of depriving the owner permanently, even though they later abandoned it."

The Supreme Court of Missouri has further held that the failure to allege in the information that the property was taken with the intent to deprive the owner thereof, is not fatal. See State v. Medley, 353 Mo. 925, 185 S.W. 2d 633, 634 and cases cited.

In State v. Phillips, 62 Idaho 656, 115 P. 2d 418, 420, the Supreme Court of Idaho had occasion to construe their statute on extortion, which also corresponds to our extortion statute, Tit. 21 O.S. 1951 § 1481, and uses the word "wrongful". In the opinion the court said in part:

"Our statute and California's statute (Sections 518 and 519, Penal Code) are the same. In construing the California statute the Supreme Court of that state, in People v. Beggs, 178 Cal. 79, 172 P. 152, 154, where this identical question was presented, said:

" 'It is the means employed which the law denounces, and, though the purpose may be to collect a just indebtedness arising from and created by the criminal act for which the threat is to prosecute the wrongdoer, it is nevertheless within the statutory inhibition. The law does not contemplate the use of criminal process as a means of collecting a debt. To invoke such process for the purpose named is, as held by all authorities, contrary to public policy. Hence good faith, or the fact that the end accomplished by such means is rightful, cannot avail one as a defense in such prosecution, any more than such facts would constitute a defense

where one compels payment of a just debt by the threat to do an unlawful injury to the person of his debtor.'

"Continuing:

" 'Our interpretation of the statute finds full support in an able and exhaustive opinion of the Supreme Court of South Dakota in a case entitled In re Sherin, 27 S.D. 232, 130 N.W. 761, 40 L.R.A., N.S., 801, Ann. Cas. 1913D, 446, where the court, having under consideration code provisions identical with sections 518, 519 and 523 of our Penal Code, said: "The word 'wrongful,' as used in the statute, has no reference whatever to the question of the justness of the ultimate result sought, but relates solely to the methods used to obtain such results." ' "

And Norris v. State, 68 Okla. Cr. 172, 96 P. 2d 540, where "in affirming a conviction for kidnapping of one who had forcibly taken possession of a motor vehicle and seized the motorist 'demanding his property with threats against his life, and carrying him away against his will for the purpose of extorting money and property from him' ", quoted with approval from People v. Malendrez, 25 Cal. App. 2d 490, 77 P. 2d 870, wherein that court said:

"Evidence that motorist was removed from possession of automobile and prevented from returning thereto by force and threats against his life, until after defendants had removed key from car and departed, authorized conviction of kidnapping for the purpose of robbery, notwithstanding that nothing was allegedly taken but key to the automobile."

In the case of People v. Sheasbey, 1927, 82 Cal. App. 459, 255 P. 836, 837, a district court of appeals of California had for consideration an appeal where the defendant had been convicted of a dual charge of robbery and kidnapping, a procedure apparently proper in that state, where the principle involved in the within case as applied to robbery and as to kidnapping are each in that case discussed and brought to focus. Accused had forcibly repossessed property sold to the prosecuting witness, and in the process had tied him and his wife with ropes and had hauled witness to a nearby town to prevent resistance to the taking, and had then released him.

The case was reversed as to the robbery as the California robbery statute requires that the taking must be "felonious." It was held that taking with force and fear was not sufficient to constitute robbery; that to supply the "felonious" element of the statute, the intent to steal or animo furandi was an essential element.

Nevertheless, construing the kidnapping statute, no comparable provision or term as contained in the robbery statute was found. It was determined as to the kidnapping statute that the purpose or motive of the taking and carrying away was immaterial. It was pointed out that as to the kidnapping nothing was urged as a defense except state of mind or motive alone. Said the court in the tenth paragraph of syllabus:

"No state of mind or belief is a part of crime of 'kidnapping,' as defined in Pen. Code, § 207, nor constitutes by itself a defense to charge, and, where no circumstances are proven which would constitute a lawful excuse, no intent is necessary, except intention of doing acts denounced by statute."

Under the common law definition of robbery (quoted in footnote 3) where it is essential that the taking of the goods be animo furandi; that is, that the taking be with the felonious intent to take and permanently deprive the owner, it is essential that such question be submitted to the jury for consideration. Proof of the taking alone is not sufficient, but the State must go further and show that such taking was not a temporary taking, and that the intent at the time of such taking was to deprive the owner of his goods permanently. See 46 Am. Jur., 143;

Guffey v. Continental Casualty Co., 109 Kan. 61, 197 P. 1098; 21 Ann. Cas. 1138, note; Galloway v. State, 126 Tex. Cr. R. 294, 71 S.W. 2d 871.

In the case of larceny, as we have seen, our statutes have been construed by this court on numerous occasions and we are committed to the rule that the taking must be animo furandi; that is, to permanently deprive the victim of the goods stolen. Saferite v. State, supra, and Hughes v. State, supra.

We have also in various cases pointed out that the distinction between the offenses of larceny and of robbery (particularly where dangerous weapons not used) is often very close, and that the criterion which distinguishes these offenses is the violence which precedes the taking. Kernell v. State, 53 Okla. Cr. 259, 10 P. 2d 287; Marks v. State, 69 Okla. Cr. 330, 102 P. 2d 955; Cannon v. State, 71 Okla. Cr. 42, 107 P. 2d 809; Randall v. State, 33 Okla. Cr. 262, 243 P. 983. We fail to find, as heretofore indicated, where this court has ever construed our definition of robbery, § 791, Tit. 21 O.S. 1951. There would have to be compelling reasons to cause us to reconsider a rule heretofore adopted if there was basis for its adoption. Paragraph one of the syllabus in Johnson v. State, 24 Okla. Cr. 326, 218 P. 179, not cited by defendant, but heretofore referred to, in effect adopts the common law definition of robbery without in any way discussing our statutory definition. It is stated: "To constitute 'robbery,' the taking must in all cases be accompanied with a felonious intent, or animus furandi; the intent must be to appropriate the property likewise as in larceny."[10]

"Animus furandi" is a Latin phrase, of course, that, as stated by the Supreme Court of Virginia in Jones v. Commonwealth, 172 Va. 615, 1 S.E. 2d 300, "is generally translated as intent to steal, a criminal intent, or an intent to feloniously deprive the owner permanently of his property.' If we must use a Latin phrase why not "animus possidendi" (with the intention of possessing), or "animus acpiendi" (the intention to take or capture)? Animo simply means "with intention." Our statute does not in terms make intention a necessary element of robbery. The definition is that, as heretofore quoted: "Robbery is the *wrongful taking* of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." There are further definitive and explanatory clauses that we have also quoted, including the statute of classification involved herein, but the above provision is the key to our problem. It would seem from the use of the word "wrongful" that our definition is more limited than the common law definition and that no intent is necessary except the intention of doing the act denounced by the statute. The word "wrongful" imports in its terms the infringement of some right, and "wrongful taking" would seem to be any taking of personal property against the will of the possessor, and if accomplished by means of force or fear it is robbery. No state of mind or belief is involved. It is the infringement of the right that makes the act wrongful,—something of more value than property is involved.

---

[10] The facts in the Johnson case are such as could have come from a John Steinbeck plot. Two of the defendants (husband and wife) had withdrawn $5,000 from a bank and hidden it about their premises; the husband was to be away on a trip to the east to see a son who was in an Army camp. A nephew of the wife, whom she had practically raised, and some other apparent ne'er-do-well relatives knew that the money was about the premises. The husband was back home, but the money disappeared. What the nephew did not know was that the money was marked. The defendants were convinced that the prosecuting witness had gotten the money, and they tried to get the officers of the law to help recover it, but apparently some unsatisfactory perfunctory questioning of the parties was the net result. So the losers of the money got reinforcements, apparently being other relatives, and after camping near the abode of the prosecuting witnesses, broke in on them and by force and fear handled the matter in their practical way, vindicating the wife's suspicion by her retrieving from the person of her nephew's wife, who was using a pocket in a skirt or petticoat as a bank, $1,100 of the marked bills. The defendants had taken the law into their own hands. There was the possibility of mistake. But this was the life savings of these people who were being made paupers by an ungrateful nephew. This was a crisis in the life of the defendants, and to them was a matter of life or death. This court facilitated the solution of the problem and favorably to the defendants, by use of the common law definition of robbery as interpreted by many courts where that definition adopted. Our statutory definition was overlooked .

It is the violation of that fundamental right so much cherished in free nations, "of life, liberty and the pursuit of happiness", and where such rights are violated in the respect stated, coupled with violent means and method employed makes the act recited robbery, so far as defined by our statute. We are, therefore, compelled to overrule Johnson v. State, supra, so far as it purports to adopt the common law definition of robbery as expressed in paragraph one of its syllabus. Such is our conclusion, though truly not easily arrived at by any means. But we are convinced from an examination of our legislative provisions that the efficiency and sufficiency of our definitive statute, Tit. 21 O.S. 1951 § 791, precludes and would not justify the reading in of words and definitive clauses not in the statute contained.

In the instant case the "robbery" was that classified by Tit. 21, O.S.A. 1951 § 801; it was at the point of a gun; defendant was being pursued by officers, the victim was forced to accompany the robbers and his pleas to be released were unavailing. He was told that "dead men tell no tales", indicating that the victim and his car were to be used to the ultimate in effort to elude capture. It is thus reasonable to assume that this car might run low on oil, its value from the rough usage might be reduced to nil. The car might in fact be driven into a deep lake or river, if such would facilitate escape and detection. There would, even if an abandonment should take place only a few miles distant, be a reckless exposure to loss.

The defendant stated on trial that his intention at the time of taking was only to use the car to escape the officers. If he could use the car temporarily and be entitled to have the jury consider such question and find him not guilty if the taking was only for a temporary deprivation, how many hours or days could he use the car, and how far could he drive it? One mile, one hundred, or ten thousand or more.? Would it make any difference if at the time the car was worth $4,000 but by reason of the rough use and damage sustained it was worth only $500 or $100 when finally repossessed? Because defendant might have used other cars along the route of escape without destroying them would not mean that he would not by the very force of circumstances involved destroy or be the causative factor in the destruction of this vehicle. Such theory of temporarily taking by the most causal analysis is to show how far from any point it can be reduced ad absurdum.

An accord with the principle contended for would tend to weaken and destroy law and order and make all citizens liable to death, humiliation or at least a loss in the value of their property at the whim of the irresponsible and dangerous and facilitate the escape of gangsters, murderers or any other criminal, and could be expected to lead to disrespect for law and force the citizen for protection to resort to drastic personal action.[11] To say that the defendant did not commit robbery, but only temporary trespass by the reason of the necessity of the element of animus furandi is to make apparent valid reasons for the rejection of such an argument. We cannot believe that many courts with the common law definition of robbery would so hold.

---

[11] To say that during the long common law interpretation such calamity has failed to noticeably develop, overlooks the fact that most juries have no doubt disregarded the excuse that the taking of a motor vehicle at gun point, for example, was for the purpose only of eluding officers, or just to make connections with a train, boat, plane, or just to go joy riding, or visit a friend in a nearby or distant city, all of which excuses would be valid under the common law definition, if believed. And the excuse might be overwhelmingly true. But the fact that such question is submitted to the jury in many instances in the past has permitted the escape of persons taking at gun point and practically rendering valueless, personal property, and then by reason of the right to have the question decided by the jury, and by the services of an adroit and brilliant criminal lawyer, making the efforts of the law enforcement officers seem ludicrous. The history of the practice in each state and in each decade is full of illustrations.

As we have noted, the instructions given included the crime charged in the words of the statute, Section 801, supra, and the term robbery was as defined by statute, Section 791, supra. Even where the common law rule prevails it has been held that where the jury was authorized to convict if they believed defendant robbed another, such was sufficient as the word "rob" imported the intent to steal (the common law meaning). See Baygents v. State, 154 Miss. 36 122 S. 187.[12]

And in this case it is our further conclusion that the statement of the defendant on trial and his failure to deny the evidence of the State as to the facts of the robbery, would not have entitled him, to the instructions requested even if the common law definition of robbery prevailed in this State, because such facts refuted the intention of temporary taking to the extent that the court was as a matter of law justified in refusing the instructions requested. The principle involved is the same as is involved where the evidence is conflicting as to whether or not a witness may have participated in committing the crime charged and was therefore an accomplice. Ordinarily such question would be one for the jury, but where the facts and the conduct of the witness are admitted, it becomes a question of law for the court. Cudjoe v. State, 12 Okla. Cr. 246, 154 P. 500, L.R.A. 1916 F. 1251; Moore v. State, 14 Okla. Cr. 292, 170 P. 519; McKinney v. State, 20 Okla. Cr. 134, 201 P. 673.

Our conclusion is that the instructions complained of, considered as a whole, were sufficient, and that the court did not err by failure to give the instructions requested.

It is finally contended that "The State, having by way of impeachment, elicited upon cross-examination of defendant, evidence of his previous convictions, the court erred in not permitting defendant to show that he presently had a good reputation for truth and veracity at the place where he lived and had been pursuing for a period of more than ten years, a course of lawful conduct." And that "the evidence is insufficient to support a judgment of conviction."

It is fundamental that the reputation of an accused, to be competent for the consideration of a jury, must relate to the time of the crime and times preceding the same. There had been years delay in trying the defendant for the crime charged, and as we have seen the circumstances recounted prevented the running of the statute of limitations as a bar to the charge. The contention that since the date of the crime charged the accused had reformed and at the time of the delayed trial had acquired a good reputation as a peaceable, law-abiding citizen, could have no bearing on the issues as of the time of the admitted armed robbery.

The state in its brief does not deny but that it is true that an attack upon the credibility of a witness may make proper the introduction of proof to show his good reputation for truth and veracity, but it is pointed out that the record in this case shows that a large part of the evidence as to the defendant's prior criminal record was first elicited from him by his own counsel on direct examination and that for such reason the defendant would not have a right to strengthen his testimony in the eyes of the jury by showing that he had a good reputation for truth and veracity. Further, that concerning the depositions not admitted in

---

[12] Steal is defined in the Thorndike and Barnhart Dictionary (1951), "1. take (something) that does not belong to one; take dishonestly; steal money. 2. Take, get or do secretly, * * * " And Webster's New International Dictionary says: "To take, and carry away, feloniously; to take without right or leave, and with intent to keep wrongfully; as, to steal the personal goods of another." But "felony" is defined as: "1. Wickedness; baseness; treachery; deceit; wrath; daring; a crime or sin." Webster goes on to state that the word felony covered homicide, rape, larceny, burglary, arson and treason, according to Blackstone, but in modern times it is "any offense that is punishable by death or confinement in the penitentiary, or State prison." See Tit. 21 O. S. 1951 § 5, which accords. However, courts have read into the definition of "felony" animo furandi as applied to robbery, and also have read animo furandi into the definition of steal, —and hence the conflict with our statutory provision, not with the usual definition of steal as applied to robbery, but to the extent of animo furandi, that has by courts been added.

evidence on the subject, that in each instance the defendant's reputation for truth and veracity was coupled with his reputation as a peaceable and law abiding citizen, and that the latter was wholly incompetent. We agree.

Finding the record to support the contentions of the state and ample evidence to support the verdict of the jury, and it being further apparent that the jury was most lenient, and without doubt treated in mitigation of the crime they found the defendant guilty of, the fact of long delay of trial and the release of accused from the life sentence in Texas, and perhaps other extenuating circumstances. This is evidenced by the minimum punishment assessed when death by electrocution could have been meted out and might have except for the honoring by the Governor of Oklahoma of the requisition by the Governor of Texas without first disposing of the charge at time pending in this State. The accused has fared lightly in view of the enormity of the crime.

The verdict and judgment appealed from is affirmed.

BRETT, P. J., and JONES, J., concur.

## On Rehearing.

PER CURIAM. Counsel for defendant, by Hon. J. S. Bracewell, of Houston, Texas, have filed a petition for rehearing. Each member of this court has given the petition deliberate consideration. The argument presented is an arresting one, and we find no fault with the citations of authority, except the applicability. Overlooked is the fact that this court, as attempted to be stressed in the opinion, has never before noticed or considered our Legislative definition of robbery, Tit. 21 O.S. 1951 § 791, which must apply to the statute of classification, Tit. 21 O.S. 1951 § 801. Johnson v. State, 24 Okla. Cr. 326, 218 P. 179, in no way treated the subject here involved. It is evident that the statutory definition was overlooked. And probably because it is true, as we have seen, that it is at variance with the definition in practically every other state. Nevertheless, it is the solemn act of our Legislature, and by our research seems to be supported by good reason.

The complaint properly described the act charged as felonious, because robbery does constitute a felony, but such fact does not justify the reading into Section 791 of the word "felonious" in the sense as used in the common law definition of robbery. Other words and terms used in the complaint and in the information not required by Section 801 of Title 21, O.S. 1951, and Section 791 of Title 21 O.S. 1951, can be treated only as surplusage. The fact of the use could not deprive the defendant of any substantial right or prejudice him in any manner.

At one other time in the history of this court we had a situation where in a number of old cases we had made the mistake of reading into a statute words not therein contained and meaning not justified by the words actually used, and although long acquiesced in, we saw fit to correct the error and proceed strictly by the statutory provisions provided by our Legislature. See Ex parte Lewis, 85 Okla. Cr. 322, 188 P. 2d 367. And see on the reasonableness and saneness of such kind of action the Eighth Annual Benjamin Cardoza Lecture delivered before the Association of the Bar of the City of New York by Associate Justice William O. Douglas of the Supreme Court of the United States on "Stare Decisis" as reported in Vol. 21, Journal 7, of the Oklahoma Bar Association, dated February 25, 1950, the pertinent point quoted on page 426 of 218 P. 2d, Roberson v. State, 91 Okla. Cr. 217, 218 P. 2d 414. So, even if it could be said that in Johnson v. State, supra, the common law definition of robbery had been read into our statutory definition, Section 791, supra, still, by authority of the above we still would be justified in adhering to the plain and unambiguous definition of robbery prescribed by our Legislature.

We too have wandered down side paths and considered whether or not our statutory definition might eliminate the many legitimate defenses successfully interposed in the past where a person was charged with robbery by use of firearms or force and fear and involving persons in pursuit of their own stolen property, or officers taking property under void writs, etc., and we do not visualize the elimination of defenses other than in the respect treated in the opinion rendered. To go into the arguments surrounding the hypothetical cases urged would constitute dicta.

The further argument presented as to the other points raised will receive no further comment as those issues have in this jurisdiction been long settled.

The application for rehearing is overruled, and the mandate is ordered issued.