**Gene Austin RIDER, Petitioner,**

v.

**H. C. McLEOD, Warden of the Oklahoma State Penitentiary, and O. A. Pruitt, Acting Sheriff of Pittsburg County, Oklahoma, Respondents.**

**No. A–12534.**

Criminal Court of Appeals of Oklahoma.

March 26, 1958.

Carroll Samara, Herbert K. Hyde, Oklahoma City, George L. Hill, McAlester, for petitioner.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., Ewing C. Sadler, County Atty., Pittsburg County, McAlester, for respondents.

POWELL, Judge.

■ The State of Oklahoma at this time has outstanding "Interstate Parole Compacts" with forty-seven other states of the Union. The State of Kansas since 1947, Missouri since 1945, and Oklahoma since 1945 have been signatory to the Compact. See 57 O.S.A.1957 cumulative pocket parts giving list. See Laws 1945, p. 186, title being, "An Act providing that the State of Oklahoma may enter into a compact with any of the United States for material helpfulness in relation to persons convicted of crime or offenses who may be on probation or parole." This Act appears as Title 57 O.S.1951 § 347, the pertinent part of which is as follows:

"The Governor of this State is hereby authorized and directed to execute a Compact on behalf of the State of Oklahoma with any of the United States legally joining therein in the form substantially as follows:

"A Compact entered into by and among the contracting states, signatories hereto, with the consent of the Congress of the United States of America, granted by an Act entitled 'An Act granting the consent of Congress to any two or more states to enter into agreements or Compacts for cooperative effort and mutual assistance in the prevention of crime and for other purposes'.[1]

---

[1]. Art. I § 10 of the Constitution of the United States prohibits a state from entering into any agreement or compact with another state without the consent of Congress. In recognition of this constitutional provision, Congress, in 1934, enacted a statute (48 Stats. 909, 18 U.S. C.A. § 420, now 4 U.S.C.A. § 111) giving its consent to the several states to enter into compacts "for cooperative effort and mutual assistance in the prevention of crime and in the enforcement of their respective criminal laws and policies, and to establish such agencies, joint or otherwise, as they may deem desirable for making effective such agreements," and construing this Act of Congress the United States Supreme Court has denied certiorari in Pierce v. Smith, 31 Wash.2d 52, 195 P.2d 112; Id., 335 U.S. 834, 69 S.Ct. 24, 93 L.Ed. 387, and in United States ex rel. Palmer v. Ragen, 7 Cir., 159 F.2d 356; Id., 331 U.S. 823, 67 S.Ct. 1311, 91 L.Ed. 1839.

"The contracting states solemnly agree:

"(1)  That it shall be competent for the duly constituted judicial and administrative authorities of a state party to this Compact (herein called 'sending State'), to permit any person convicted of an offense within such state and placed on probation or released on parole to reside in any other state party to this Compact (herein called 'receiving State'), which while a [on] probation or parole, if

"(a)  Such person is in fact a resident of or has his family residing with [sic] the receiving state and can obtain employment there;

"(b)  Though not a resident of the receiving state and not having his family residing there, the receiving state consents to such person being sent there.

"Before granting such permission, opportunity shall be granted to the receiving state to investigate the home and prospective employment of such person.

"A resident of the receiving state, within the meaning of this Section, is one who has been an actual inhabitant of such state continuously for more than one year prior to his coming to the sending state and has not resided within the sending state more than six (6) continuous months immediately preceding the commission of the offense for which he has been convicted.

"(2)  That each receiving state will assume the duties of visitation of and supervision over probationers or parolees of any sending state and in the exercise of those duties will be governed by the same standards that prevail for their own probationers and parolees.

The Supreme Court of the United States has upheld compacts between states, including compacts relative to water rights. See State ex rel. Dyer v.

"(3)  *That duly accredited officers of a sending state may at all times enter a receiving state and there apprehend and retake any person on probation or parole. For that purpose no formalities will be required other than establishing the authority of the officer and the identity of the person to be retaken. Any legal requirements to obtain extradition of fugitives from justice are hereby expressly waived on the part of states party hereto, as to such persons. The decision of the sending state to retake a person on probation or parole shall be conclusive upon and not reviewable within the receiving state:* Provided, however, That if at the time when a state seeks to retake a probationer or parolee there should be pending against him within the receiving state any criminal charge, or he should be suspected of having committed within such state a criminal offense, he shall not be retaken without the consent of the receiving state until discharged from prosecution or from imprisonment for such offense.

"(4) That the duly accredited officers of the sending state will be permitted to transport prisoners being retaken through any and all states parties to this Compact, without interference. * * *"  [Emphasis now supplied.]

Petitioner being in custody of the Warden at the State Penitentiary at McAlester applied to the district court of Pittsburg County for a writ of habeas corpus, but in the meantime petitioner was placed in custody of the sheriff of Pittsburg County, and the said sheriff was made a party to the proceedings, where it was alleged he was being "held for Kansas authorities." After a hearing the district court of Pittsburg County denied the writ, and thereafter independent application was made to this court for a writ of habeas corpus, a procedure permissible under our practice.

Sims, 341 U.S. 22–36, 71 S.Ct. 557, 95 L.Ed. 713, and Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202.

There is no provision in this State for appeal to this court from adverse action by a trial court on a petitioner's application for a writ of habeas corpus. A transcript containing the testimony heard and the exhibits received in evidence in the district court was at hearing before this court admitted in evidence.

The record discloses the following:

Gene Austin Rider was convicted of the crime of grand larceny in the district court of Finney County, Kansas, and sentenced to the penitentiary for the period of one to five years, one year being the minimum sentence, and five years the maximum; that he served upon said sentence in said Kansas penitentiary one year and one month of "solid" time, and that he served the minimum time fixed by law in the State of Kansas for said crime; that at the conclusion of said minimum sentence and on October 5, 1954 he was recommended for parole by the Board of Penal Institutions of the State of Kansas, which recommendation was approved by the Governor of that state, and on October 15, 1954 he entered into an agreement with the state of Kansas to go to the state of Missouri under a retainer theretofore filed by the chief of police of the city of Saint Louis, state of Missouri, as will be hereinafter detailed. In accordance with the agreement, petitioner was on release from the Kansas State Penitentiary taken by a representative of the chief of police of Saint Louis to that city and placed in jail to stand trial on a charge of armed robbery there pending. After a number of hearings and continuances, extending over a period of two months, two city detectives, following a hearing, told petitioner to get his possessions as he was to go free, and that petitioner asked them where he was to go, and that they advised him that anywhere was all right as long as he got out of Missouri. That immediately after his release from the jail, petitioner returned to the home of his father and mother in Oklahoma City, and that he remained at the home of his parents for approximately six months, during which time he was employed as a barber at two different barber shops in Oklahoma City, and that at the expiration of such period he was charged with grand larceny in Oklahoma County and was sentenced to the Oklahoma State Penitentiary at McAlester for a period of three years, and that with good time his sentence expired on August 1, 1957, when he was delivered to the sheriff of Pittsburg County, Oklahoma, by the Warden of the Oklahoma State Penitentiary on a "hold" order from the State of Kansas, as being a fugitive from justice and for violating the Kansas parole, as aforesaid. Such is the gist of petitioner's testimony.

Based on such showing, counsel for petitioner assert that "as a matter of law this man could not have been a fugitive from justice from the State of Kansas, or from Missouri, for the reason that the State of Kansas waived jurisdiction over this petitioner when they released him to the State of Missouri to answer a charge in that State."

It is further urged that the State of Kansas delegated to the State of Missouri the duty and obligation of what disposition be made of the person of petitioner when the State of Missouri was through with him.

It is contended that section 347 of Title 57, "Out of state parolee supervision— Compacts with other states" pertinent portions of which we have quoted above, does not apply to this case by reason of previous holdings of this court which we shall consider later on. However, at this point we find that this court has never previously had occasion to construe or consider our statutory provisions involving parolees and compacts with other states. We need, therefore, in connection with 57 O.S.1951 § 347 to consider certain pertinent exhibits which defendant admitted having signed and which are reflected in the record before us.

First, there is the consideration of the action of the Board of Penal Institutions on the application of Gene Austin Rider, No. 11495 for a parole from the Kansas

State Penitentiary. It is set out that on October 5, 1954 at the regular meeting of the Board of Penal Institutions, the Board considered the application of Gene Austin Rider, No. 11495, for a parole. It was recited that he had been convicted of the crime of grand larceny by the district court of Finney County, State of Kansas, and sentenced to the penitentiary for the period of one to five years, and had served one year and one month of "solid" time, the minimum time fixed by law for punishment for the crime for which convicted; that his prison record was good; that the release of said prisoner on parole was recommended by the Board of Penal Institutions. *"Parole to detainer."* [Emphasis supplied.]

The Board made findings that Rider was eligible for parole, and directed the Warden of the Penitentiary to release him from confinement, "but not from legal custody of said warden, whenever suitable employment, where he shall be surrounded by proper influences, shall have been found for him." On October 11, 1954 the Governor of Kansas approved the proceedings.

Then next there is an agreement of Gene Austin Rider to return from the State of Missouri to Kansas. It reads:

"I, Gene Austin Rider, # 11495, in consideration of being granted parole by the Board of Penal Institutions and especially being granted the privilege to leave the State of Kansas to go to Missouri, hereby agree:

"1. That I will make my home with (name) Detainer; (address) Chief of Police, St. Louis, Missouri, until a change of residence is duly authorized by the proper authorities of Missouri (Receiving State).

"2. That I will comply with the conditions of parole as fixed by both the States of Kansas and Missouri (Receiving State).

"3. That I will, when duly instructed by the Administrator of the Interstate Parole Compact, return at any time to the State of Kansas.

"4. That I hereby do waive extradition to the State of Kansas from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Kansas.

"5. Failure to comply with the above will be deemed to be a violation of the terms and conditions of parole for which I may be returned to the State of Kansas.

"Dated: October 15, 1954.
(Signed) Gene Austin Rider #11495."

On this instrument it is certified by Irma C. Walsh, Administrator Interstate Parole Compact that: "On the 16th day of October 1954, permission was granted to the above person to reside in the State of Missouri and to be supervised by Kansas and Missouri."

On the same day Gene Austin Rider entered into a written Parole Contract with the Board of Paroles of the State of Kansas, pertinent portions of which read:

"* * * Fifth: He shall not own or have in his possession fire arms of any description for any purpose without the written consent of his parole officer.

"Sixth: He shall not leave the general vicinity of the place to which he is paroled without the written consent of his parole officer. The name and address of his parole officer will be furnished the subject at the time he is released on parole from the penitentiary. *If the subject is paroled out of Kansas he shall obtain such permission from his out of state parole officer.*

"Seventh: He shall, not later than the fourth day of each month, mail to the Record Clerk of Kansas State Penitentiary a statement of his occupation, his residence address, the name and address of his employer, or location of the employer's place of business. Form printed cards will be furnished the parolee on which to make his re-

ports. These monthly reports must be made regularly until such time as the parolee receives a final discharge. If the parolee is out of Kansas he shall make his monthly reports as instructed by out of state parole officer.

"The parolee must not return to Kansas State Penitentiary, or any part of the prison property without permission from the Warden or Deputy Warden. Should the parolee wish to visit the Warden, Deputy Warden or Record Clerk he must first make an appointment by letter or by telephone. Parolee must not correspond with inmates of the penitentiary either while on parole or after discharge.

\*    \*    \*    \*    \*    \*

"Ninth: He shall not own or operate any motor vehicle without the written consent of his parole officer.

"Tenth: *When a man is paroled to a detainer he shall, as soon as he knows what disposition has been made of his case, inform the Record Clerk of Kansas State Penitentiary. Should he be incarcerated in another penal institution he shall make regular monthly reports to the Record Clerk at Kansas State Penitentiary the same as though he were on parole.*

"Eleventh: If report cards should be lost, report same to the Record Clerk by letter.

"Paroled To: Detainer: Chief of Police, Saint Louis, Missouri. The parole officer and the officials of Kansas State Penitentiary are representatives of the Governor, Pardon Attorney and the Board of Penal Institutions, and all concerned are vitally interested in the re-habilitation and the future welfare of the parolee. *The parolee shall feel free* to call upon any of the above mentioned officials for advice at all times. *The parolee must be law-abiding at all times. The violation of any of the above rules or the violation of the law in any way, will constitute violation of the parole*

*contract and the parolee may be declared delinquent and treated as an escaped prisoner owing time to the State of Kansas.* At such time as he may be returned to the penitentiary he may be required to serve the remainder of his maximum term and no part of the time which may elapse from the date of his delinquency to the date of his return to Kansas State Penitentiary shall apply to his maximum term. This contract shall be signed by the parolee and witnessed by the Record Clerk of Kansas State Penitentiary at such time as the parolee is released from that institution.

"I, Gene Austin Rider, No. 11495, an inmate of the Kansas State Penitentiary, hereby declare that I have carefully read and do clearly understand the contents and conditions of this parole contract, and I hereby accept the same, and pledge myself to honestly comply with all said conditions.

"Signed this 16th day of October, 1954.

"/s/ C. W. Wilson, Record Clerk.
"/s/ Gene Austin Rider, Parolee."
[All emphasis now supplied.]

As we view this case, the question of whether or not the action of the State of Kansas by paroling the petitioner Rider to the Chief of Police of Saint Louis, Missouri, (there to answer to a charge pending), amounted to a waiver thereafter of jurisdiction over petitioner unless he should be found within the borders of Kansas, determines whether the writ should or should not issue.

As we have indicated, this court has never had occasion to construe 57 O.S. 1951 § 347, the Interstate Parole Compact Act. Acting under such Act heretofore quoted, the Board of Penal Institutions of the State of Kansas recommended to the Governor of that State that Gene Austin Rider having served the minimum of a one to five year sentence, and his record being good, that his application for a pa-

role be considered, and it was then recommended that he be paroled to detainer. Then followed a signed agreement of Gene Austin Rider whereby he specifically agreed to a parole to detainer, Chief of Police of Saint Louis, Missouri, and to return to Kansas under the conditions specified and quoted above; and it was provided: "That I hereby do waive extradition to the State of Kansas from any jurisdiction in or outside the United States where I may be found and also agree that I will not contest any effort by any jurisdiction to return me to the State of Kansas."

Then we have seen from the Parole Contract entered into on October 16, 1954 by petitioner with the Board of Paroles of the State of Kansas, among other things, that he was not to leave the general vicinity of the place to which paroled without the written consent of his parole officer. He was to make certain reports to the record clerk of the Kansas State Penitentiary each month. And it was provided that as soon as he knew what disposition was made of the case pending against him (where paroled to detainer) to inform said record clerk. He agreed to be law-abiding at all times, and agreed that the violation of any of the rules agreed to would constitute a violation of the parole contract and that he might be declared delinquent and *"treated as an escaped prisoner owing time to the State of Kansas."*

We have seen that petitioner did in fact leave Saint Louis and come to Oklahoma, and that after he got here he was convicted of the crime of grand larceny and sentenced to the Oklahoma State Penitentiary at McAlester to serve a term of three years, and prior to the completion of his sentence the Kansas authorities revoked his parole and placed a hold order against him.[2]

Can it be said that the State of Kansas surrendered jurisdiction to take into custody the petitioner wherever he might be found, if the Kansas authorities decided that he had violated the terms of his parole? Clearly not, if the terms of the parole contract signed by petitioner can be said to mean anything. The only limitation under 57 O.S.1951 § 347(3) would be that if a probationer or parolee should have pending against him in the receiving state (deemed to be Oklahoma at this time, under the facts recited) any criminal charge or he should be suspected of having committed within this State a criminal offense, he cannot be retaken without the consent of the receiving state until discharged from the prosecution or from imprisonment for such offense.

And under the Compact, same reference, we see that: "Duly accredited officers of a sending state may at all times enter a receiving state and there apprehend and retake any person on probation or parole. For that purpose, no formalities will be required other than establishing the authority of the officer and the identity of the person to be retaken. Any legal requirements to obtain extradition of fugitives from justice are hereby expressly waived on the part of the states parties hereto, as to such persons. The decision of the sending state to retake a person on probation or parole shall be conclusive upon and not reviewable within the receiving state."

▮ In construing the Interstate Compact Act it has been held by good authority that one convicted of crime has the right to reject an offer of parole, but once having elected to accept parole, the parolee is bound by the express terms of his conditional release. See Ex parte Peterson, 14 Cal.2d 82, 92 P.2d 890; Ex parte Ten-

---

2. See Ex parte Tabor, 173 Kan. 686, 250 P.2d 793, for treatment of powers granted the Warden of the Kansas State Penitentiary to revoke paroles of convicts. It was said: "An inmate of the penitentiary who is granted a parole accepts such parole subject to the terms and

provisions of G.S.1949, 62–1525, authorizing its termination without notice or hearing, and hence is precluded from claiming he was entitled to have the question whether he had violated the conditions of his parole adjudicated before such parole was revoked."

ner, 20 Cal.2d 670, 128 P.2d 338; Pierce v. Smith, 31 Wash.2d 52, 195 P.2d 112.

█ While in People ex rel. Rankin v. Ruthazer, 304 N.Y. 302, 107 N.E.2d 458, 460, the main contention of petitioner for writ of habeas corpus (in custody in New York for return to Michigan, from which state he had been paroled to answer a charge in New York), was that he was not in fact a parole violator, we are constrained to quote liberally therefrom in that the "Interstate Parole Compact" law is treated as paramount. Said the Court:

"The following facts are undisputed in this habeas corpus proceeding. In August, 1939, this relator was convicted, in Michigan, of the crime of robbery and was sentenced to a term of from ten to thirty years. At the time of that conviction he was under indictment in New York County for the crime of murder in the first degree. In December, 1945, *he was paroled from prison in Michigan for delivery to the New York authorities* on that murder charge. [Emphasis supplied.] The Michigan Parole Board order contained a proviso or condition, of which relator was informed, that if the New York murder charge should be dropped, the New York authorities were to notify the Michigan authorities so that a parole, in New York, on the Michigan sentence could be arranged, pursuant to the 'Interstate Compact' supra. The murder indictment was dismissed in New York in May, 1947, but, responsive to a request from the Michigan authorities, the New York authorities detained relator. In August, 1947, there was granted to relator by the Michigan parole authorities a parole by the terms of which he was allowed to remain at liberty, not in Michigan, but in New York. Among the conditions of that parole, agreed to by relator, were these: that relator was to be employed by a named New York company and to be supervised by a named New York parole department employee. That Michigan parole, by its terms, was not to terminate before May 27, 1951, but it provided, as do all such paroles, that it was subject to the conditions that relator would keep and observe all lawful parole provisions imposed by the Michigan Parole Board.

"In March, 1950, the State of Michigan issued a warrant for the arrest of the appellant as a parole violator, declaring him 'delinquent' as of February, 1950. In other words, Michigan, asserting that relator had violated his parole in February, of 1950, issued a warrant demanding that he be arrested in New York and returned to Michigan, pursuant to subdivision 1(3) of section 224 of the Correction Law above quoted. Relator then sued out this writ of habeas corpus, and it came on for a hearing at Special Term. * * *

"We point to the second sentence of subdivision 1(3) of the compact in section 224 above quoted: 'For that purpose no formalities will be required other than establishing the authority of the officer and the identity of the person to be retaken.' At the Special Term hearing in this case, those two facts were expressly conceded by relator. That was really the end of the case, since at that point relator had had his full habeas corpus rights.

* * * * * *

"Under the Uniform Criminal Extradition statute,[3] when extradition is

---

3. See, generally par. 1141.1 et seq. and particularly pars. 1141.5, 1141.23, Tit. 22 O.S.A., Laws 1949, p. 207, § 1. And see par. 3 of syllabus in Ex parte Beam, 96 Okl.Cr. 207, 252 P.2d 179 construing the Uniform Extradition law, which Oklahoma adopted in 1949. Also, for cases other than those cited herein, and dealing with the interstate parole compact, see:

Woods v. State, 264 Ala. 315, 87 So.2d 633; Gulley v. Apple, 213 Ark. 350, 210 S.W.2d 514, 515; United States ex rel. Palmer v. Ragen, 7 Cir., 159 F.2d 356; Whitten v. Bennett, 7 Cir., 141 F.2d 295; People ex rel. Ross v. Becker, 382 Ill. 404, 414, 47 N.E.2d 475, 480; United States ex rel. Hunke v. Ragen, 7 Cir., 158 F.2d 644, 645.

sought on the ground that a person accused of crime in another state is here as a fugitive from justice, it need only be shown that the person detained is the same person sought, and that he was in the demanding State at the time of the crime. Similarly, under the uniform 'Interstate Parole Compact' law, supra, when the return to the demanding State is sought of an alleged parole violator, it need only be shown that he is the same person described in the papers, and that the officers from the demanding State are authorized persons. Those facts were conceded here. Relator argues that the procedure followed here violates section 9 of article I of the Federal Constitution prohibiting the suspension of the writ of habeas corpus, and violates, also, the Fourteenth Amendment of that Constitution as to due process and equal protection of the laws, and, further, that there was here violated the habeas corpus, due process and equal protection of law guaranties found in Article I of our State Constitution. We find no such violation."

In Ex parte Tenner, 1942, 20 Cal.2d 670, 128 P.2d 338, 342, the court after discussing the legislation in aid of the act of Congress concerning extradition, said:

"But all legislation which the courts have heretofore considered had reference to the federal extradition procedure. The interstate compact, however, is not of that character. It provides: 'All legal requirements to obtain extradition of fugitives from justice are hereby expressly waived on the part of States party hereto, as to such persons.' § 3(3). This can only mean that states which are parties to the compact have established a method to procure the return of parolees from one state to another, which is entirely independent of the extradition procedure."

The court went on to hold valid and constitutional the Interstate Compact. Many other courts have agreed.

The court also held that a convict whose parole has been revoked is a fugitive from justice within the meaning of Rev. Stat. § 5278, 18 U.S.C.A. § 662,* even though he entered the asylum state with the consent of the paroling authorities. Ex parte Tenner, supra; In re McBride, 101 Cal.App. 251, 281 P. 651.

And in Pierce v. Smith, 31 Wash.2d 52, 195 P.2d 112, 113, it was held in construing the interstate compact, that:

"Where prisoner had been released on parole and given permission to return to Oregon, where he was placed under supervision of the Oregon Parole Board, upon violation of parole, extradition proceedings were not necessary to effect return of the prisoner from Oregon. Laws Oregon, 1937, c. 36; Rem.Rev.Stat. §§ 10249–2, 10249–11; 18 U.S.C.A. § 420."

In Ex parte Guinn, Tex.Cr.App., 284 S.W.2d 721, 722, the court of Criminal Appeals of Texas in construing not the Interstate Parole Compact, but the Uniform Extradition Act, which Oklahoma adopted in 1949, in paragraph 3 of the syllabus, said:

"Under Uniform Criminal Extradition Act, accused could be extradited to Oklahoma even though he had left Oklahoma involuntarily to answer a criminal charge in Texas."

Counsel for defendant have, as stated, cited a number of cases from this court said to be conclusive of the issue urged. The first of the cases cited is Ex parte Guy, 1928, 41 Okl.Cr. 1, 269 P. 782, and therein held that where a prisoner was undergoing sentence in this State after conviction of a felony and the Governor of this State delivered him to Federal authorities for prosecution with the only condition that he be returned to the State authorities after conviction and satisfac-

* Now 18 U.S.C.A. § 3182.

tion of the judgment in the Federal Courts, that such act of the Governor amounted to a pardon.

The court in the Guy case cited Ex parte Youstler, 1928, 40 Okl.Cr. 273, 268 P. 323, which held that Governor's surrender of a person at liberty pending appeal from conviction to sister state waives state's jurisdiction over person and right to demand his return as fugitive, but upon his return to the State judgment may be satisfied, and court upon habeas corpus will not inquire into manner of acquiring jurisdiction of person. This holding was based on an old Tennessee case, State v. Allen, 21 Tenn. 258. The rule announced in Youstler has been affirmed in Adams v. Waters, 1951, 94 Okl.Cr. 428, 237 P.2d 914; in Ex parte Hart, 1952, 95 Okl.Cr. 269, 244 P.2d 859; in Traxler v. State, 1952, 96 Okl.Cr. 231, 251 P.2d 815, and Samet v. McLeod, Okl.Cr.1955, 291 P.2d 836, 837, and possibly other cases.

In each of the cited cases the prisoner had either been returned to Oklahoma against his will or had come in by his own volition. The real holding in view of such facts was that the presence of the person in this State gave the State jurisdiction over him and that the State courts would not inquire into the manner by which jurisdiction of the person was obtained; that is, how he happened to be back in the State.

While so holding, inter alia, a further statement in Youstler and many following cases, was approved, and being that the surrender of a person at liberty (parole) pending appeal from conviction, to sister state waives State's jurisdiction over the person and right to demand his return as a fugitive.

As already cautioned, it must be noted that none of these cases take into consideration the Interstate Parole Compact. Prior to this Compact, a State's jurisdiction was without question limited to the area within the State's borders. But under the conditions specified in the Compact, this was changed.

In the Samet case, Samet was serving a ten-year sentence plus life imprisonment, being committed in 1946. But the Pardon & Parole Board of Oklahoma recommended to the Governor that Samet be paroled to the State of New York, to return for completion of imprisonment on a prior conviction of robbery with fire arms, in that State, as a parole violator. The Governor accepted the recommendation and an order of parole was made and entered on March 10, 1950, parolling Samet to the State of New York, for imprisonment in that State, Samet claimed that he really was not released on a valid parole, but that the instrument was a pardon, and that the State was without jurisdiction to issue the warrant for his arrest for parole violation, whereby he was re-imprisoned in the Oklahoma State Penitentiary. Samet had signed a parole agreement.

Although the Uniform Criminal Extradition Act was adopted in Oklahoma in 1949 (22 O.S.1951 § 1141.1 et seq.) and the Interstate Parole Compact in 1945, these acts were not discussed, but in the body of the opinion the court did discuss the validity of a written parole agreement, as follows:

"In the case at bar, the instrument is in fact what purports to be, a parole, for a definite purpose, 'to the custody of the New York Parole Authorities for return to imprisonment in that State', with the distinct understanding, as set forth therein, that, 'I am to remain on parole until such time as my parole is revoked, or I may be granted a pardon by the Governor of the State of Oklahoma.' In addition thereto, it was provided, 'I hereby waive all extradition rights and process and agree to return to Oklahoma at any time during my parole that I am directed to do so by the Pardon and Parole Officer. Furthermore, there was attached to the conditions, a special condition, as follows: 'It is a special condition of the parole that the said William Peter Samet,

No. 47295, shall be released under this parole only in the custody to the New York Police authorities for return to imprisonment in that State.' Moreover, in the instructions contained in said parole, we observe, that it provided, 'I am also fully aware that, under the law, the Governor, where recommended by the Pardon and Parole Officer, may remand or revoke my parole at any time, and for any reason by him deemed sufficient.' It is thus apparent that the objects and purposes of the release of the petitioner by the State of New York are definite, certain, and unqualified and wholly without ambiguity. *To all of the foregoing conditions, the petitioner agreed over his signature which, by him, became a contractual obligation with the State of Oklahoma.* There can be no doubt under the foregoing conditions, that the Governor of the State of Oklahoma executed herein a parole only, and not a pardon, or a conditional pardon, such as the court was confronted with in the Guy case." [Emphasis now supplied.]

We conclude that the facts do not disclose a case of surrender of jurisdiction over Gene Austin Rider, petitioner herein, nor is there involved the matter of extradition whereby under the Uniform Act (22 O.S.A. § 1141.1 et seq.) states parties to the agreement are enabled to surrender temporary custody of a prisoner to another state without losing jurisdiction, but it is simply a matter of the performance by Oklahoma of the terms and conditions of the solemn Compact with the other states of the Union, as pledged.

■ Therefore, the questions on habeas corpus when the Interstate Parole Compact is relied on are: (1) Whether there is a compact between the governors as authorized by the statute; (2) whether the officer apprehending the person involved is a duly accredited officer of the sending state (Kansas here); (3) whether the person apprehended is in fact a probationer or parolee of that State; and (4) whether the sending state has revoked the probation or parole of the person apprehended and decided to retake him. The record reflects an affirmative answer to each query.

The petition for writ of habeas corpus is, therefore, denied.

BRETT, P. J., and NIX, J., concur.