In the Matter of the Habeas Corpus of John Richard ANDERSON, Petitioner,

v.

The STATE of Oklahoma, and Jim Kindred, Jr., Sheriff of Pittsburg County, Oklahoma, Respondents.

No. A–13378.

Court of Criminal Appeals of Oklahoma.

Oct. 16, 1963.

George L. Hill, McAlester, for petitioner.

Charles Nesbitt, Atty. Gen., Richard A. Penix, Pittsburg County Atty., for respondent.

NIX, Judge.

This is an original proceedings filed by the petitioner, John Richard Anderson, in which he prays for a Writ of Habeas Corpus seeking his release from the Pittsburg County Jail wherein he alleges he is being restrained illegally by said Sheriff upon what is commonly known as a "hold order" from the State of Texas on a charge alleged to be pending there. This Cause was set for hearing on May 23, 1963, and from the argument presented therein, the petition, and record, the following facts were presented:

■ The petitioner was discharged from Oklahoma State Penitentiary on April 11, 1963, after serving an 8 year sentence for Larceny of Domestic Animals from McCurtain County, Oklahoma. He was arrested that day and placed in the Pittsburg County jail after being informed that he was being held as a fugitive from justice from the State of Texas for an alleged charge of Larceny of Domestic Animals from Bowie County, Texas. It appears from the record that the petitioner was arrested on that charge on December 31, 1958, and was forcibly brought across the state line to Idabel for the purpose of investigating some missing cattle there in McCurtain County. That the officers were slapping and cussing the petitioner around right in the street in Idabel, and the former Sheriff of McCurtain County testified as follows regarding this:

"Q. You are a former officer of Mc-Curtain County are you?

"A. Yes sir.

"Q. What was that office?

"A. Sheriff of McCurtain County.

"Q. How long were you sheriff?

"A. Four years.

"Q. Were you the duly elected, qualified and acting Sheriff of Mc-Curtain County on or about December 31, 1958?

"A. Yes sir.

"Q. Do you know the petitioner in this case, John Richard Anderson?

"A. Yes sir.

"Q. How long have you known him?

"A. Long prior to that date up until now.

"Q. Then you knew him at that time?

"A. Yes sir.

"Q. I will ask you if you had occasion to see him on or about the 31st day of December, 1958?

"A. Yes sir.

"Q. Would you please state, by permission of the Court, in narrative form, the occasion on which you saw him, who he was with, where you learned he came from, etc? State about what time of the day was it please?

"A. Well, when I first saw him it was in the morning. The Sheriff and Deputy Sheriff of Texarkana had brought him to Idabel and I believe left him in jail overnight. So I saw him the next morning early.

"Q. Did you learn whether or not they had him in custody?

"A. Yes sir.

"Q. Did they or did they not?

"A. Yes sir.

"Q. For what county, if you know, did they have him in custody?

"A. Bowie County.

"Q. Do you know why he was brought to your County to start with?

"A. Yes sir.

"Q. Why?

"A. You mean why they brought him up there?

"Q. Yes.

"A. Well—I had had him charged with theft of cattle and horses. And I had them to pick him up for me. So they brought him up there this night and it was my understanding that he told them he had stole 17 head of their cattle, which was located in my county.

"Q. The cattle of somebody in Texas?

"A. Yes sir. Out from Bowie County and brought them to McCurtain County. Well—early the next morning when I learned he was in jail I had them bring him down to my office and talked to him. I questioned him about the cattle—of course about my own. So he told me where the cattle were at that time. Well I believe I stated to him that there wasn't even any fence around it. I was familiar with the place. So they all got in the car, the Sheriff from Bowie County and the Deputy Sheriff—he was riding with them and we went and follered them along up toward the pasture. We got up near this place and I understand, or probably he had told them that there wasn't any cattle up there. But we went on up to the point he stopped em at and we stopped there and got out —there was a lot of cussing going on—this boy had lied to them about the cattle. It went on I imagine five minutes or more, shaking him and roughing him around. So this deputy, he was handcuffed, and the deputy reached over and grabbed him and said, 'I'm going to knock that other damn eye out for you.'

"Q. Knock the other eye out?

"A. Yes sir. So he held his hand on his fist and I went over and stopped him and told him I didn't want any trouble in my county and they wasn't going to beat him up there. So that stopped it and I didn't hear any more. We stood there a little bit and I said 'Well, let's go on back.' Well he wanted to go back with me—Well, he was in their custody. And I said 'No, you will have to go with them.' And he said, 'No, they'll beat me up before I get back.' So I told the officers before I left 'Now, I don't want no trouble in my county.' So we went on up and they parked in front of the theatre, which is across—they was between the jail and the theatre.

"Q. Right in town in the city of Idabel?

"A. Yes sir. I set there in the office and I could hear some more loud talking and cursing and going on. So I just got up and walked out there and told Dale, I believe his name was Bill Dale, I am not sure of that name:

"Q. The Sheriff?

"A. The Deputy Sheriff.

"Q. The Deputy Sheriff?

"A. Yes sir. The Sheriff never had said anything. So I told him I did not want any more of that loud talking or I was going to put him in jail. So I just said as little as I had to and kinda turned around to go back. The car started up at the curb and backed approximately 4 or 5 feet and stopped and they called me back. They said 'Do you want this God-damned son of a bitch, we might kill him before we get back?' I said 'Yes sir, I sure do.' So they put him out of the car, unhandcuffed him and I carried him in.

"Q. You knew at that time from them that he was in their custody for

an offense that occurred in Bowie County, State of Texas?

"A. Well, he had told me before I left the office that he had signed a waiver to come up with them and agree to go back. Now, I didn't see it, didn't read it—that was just what he told me.

"Q. They came up to investigate that crime?

"A. Yes sir.

* * * * * *

"Q. Was any waiver of extradition ever shown to you?

"A. No sir.

"Q. You never saw any paper of any sort at all that was a waiver of extradition?

"A. No sir.

"Q. There has been exhibited in this case here a paper that purports to be a signed extradition back from your County, from the State of Oklahoma Back to the State of Texas. Did you ever see this boy sign any such paper as that, Sheriff?

"A. No sir.

"Q. Did you ever see any such paper as that?

"A. No sir. I didn't see any papers whatsoever."

AND FURTHER THAT:

"A. No sir. They never said they wanted him back. * * * But they didn't make any remark they wanted him, they wanted a warrant put on him or anything. They just un-handcuffed him and said 'There he is.'

"Q. Didn't leave any hold order with you or anything like that?

"A. No sir. No warrant—I didn't take any warrant to the penitentiary or anything."

From this testimony and evidence, it is apparent to anyone that the release of the petitioner by the Texas Authorities was absolute, unconditional, and voluntary.

Since the purported waivers were not signed in accordance with the law, and both were signed in Texas, but not properly, it will not be necessary to determine that issue in this case. The question to be resolved herein is this:

DID THE VOLUNTARY SURRENDER OF PETITIONER BY THE TEXAS AUTHORITIES CONSTITUTE A WAIVER OF JURISDICTION AND THE RIGHT TO DEMAND THE RETURN OF PETITIONER TO TEXAS AS A FUGITIVE FROM JUSTICE?

This Court is of the opinion that it did, unquestionably. Since the passage of the Uniform Extradition Act in 1949, the mistaken tendency has arisen that this Court can inquire only as to (1) whether the defendant was in the demanding state at the time of the crime, or (2) that he is the person so identified. And this Court so held in the case of Ex parte Deere, 93 Okl.Cr. 291, 227 P.2d 420:

"Where extradition papers required by statute are in proper form and extradition warrant has been issued by the Governor, and the extradition is not based upon the provisions of Sec. 6 of Uniform Criminal Extradition Act, 22 O.S.Supp. § 1141.6, the only evidence admissible on habeas corpus to secure release from custody under the warrant of extradition is such as may tend to prove that defendant was not in demanding state at time crime was allegedly committed, or that the person sought to be extradited is not actually the person charged with the crime in the demanding state."

Prior to that time the Court was committed to the rule that the question of good faith of the prosecution is open to inquiry on habeas corpus and that the proceedings may be reviewed to see that no extradition is consummated on a mere pretext or to subserve private malice or some ulterior purpose. However, it is not necessary herein to discuss whether the adoption of the

Uniform Criminal Extradition Act completely closes the door to inquiry into motive or good faith where the evidence is clear and convincing and as no evidence was offered in the case at bar to overcome the presumption of good faith.

■ This Court said in the case of Ex parte Crawford, Okl.Cr., 342 P.2d 580:

"The requirements which the demanding state must adhere to are simple and well established by law: that the accused must be charged with a crime in demanding state and be a fugitive from justice of such state. However, if in a habeas corpus proceeding, accused can successfully controvert either, he or she is entitled to be discharged."

"In considering the evidence in this respect the court is fully cognizant of its duty and responsibility to lend the state's fullest cooperation to the strict enforcement of the Act and never permit our state to become an asylum for fugitives from justice. On the other hand the authority to protect the citizens of this state from illegal arrest and detention must never be watered down, waived, or abandoned."

In the case at bar, the evidence presented for the petitioner was carefully considered by this Court. It was never contradicted on the question of his release by the Texas Authorities, and the testimony of the Sheriff lent great weight in his favor.

■ It was further held in the Crawford case, supra:

"On original petition in Court of Criminal Appeals for writ of habeas corpus for discharge of petitioner from writ of extradition, Court of Criminal Appeals could inquire into questions whether petitioner was the person charged with crime in demanding state and *whether petitioner was a fugitive from justice*. 22 O.S.1951 § 1141.1, et seq."

"One sought to be extradited must be charged with a crime in the demanding state and *must be a fugitive from justice of such state.* 22 O.S.1951 § 1141.1 et seq." (Emphasis ours.)

Therefore, it is clearly spelled out under the Uniform Criminal Extradition Act, the person sought to be extradited must be substantially charged with a crime against the demanding state and be a *fugitive from justice.*

How could it be said that a person over whom the demanding state had voluntarily waived jurisdiction is a fugitive from justice?

■ The rule in numerous decisions in Oklahoma and other jurisdictions make it clear that the defendant is not subject to extradition where there has been a waiver of jurisdiction. It cannot be said that once that jurisdiction is waived it can be restored by virtue of the Uniform Extradition Act, but to the contrary. Where there is a waiver of jurisdiction, the petitioner in no wise would be considered a fugitive from justice, therefore, could not be extradited under the provisions of the Act.

This Court said in Ex parte Youstler, 40 Okl.Cr. 273, 268 P. 323:

"It may be conceded that; where a person is convicted in this state and pending his appeal, while at liberty on the supersedeas bond, is delivered by the Governor under requisition to a sister state, such delivery amounts to a waiver of the jurisdiction of this state over his person, and when, under such requisition, he is taken out of the state, he is not a fugitive, and this state would not have the right thereafter to extradite him from another state as a fugitive."

"Since the rendering of petitioner to the authorities of the state of Missouri was a waiver of the right of this state to return the petitioner to this state after his release there, he could have successfully resisted any attempt by the authorities of this state to return him here."

This rule of law is well established in this state and is clearly approved in the following cases: Ex parte Middaugh, 40 Okl.Cr. 280, 268 P. 321; Adams v. Waters, Warden, 94 Okl.Cr. 428, 237 P.2d 914; Ex parte Guy, 41 Okl.Cr. 1, 269 P. 782; Ex parte Hart, 95 Okl.Cr. 269, 244 P.2d 859; In re Habeas Corpus of Samet v. McLeod, Warden, Oklahoma State Penitentiary, Okl.Cr., 291 P.2d 836; Traxler v. State of Oklahoma, 96 Okl.Cr. 231, 251 P.2d 815; Jarrett v. State of Oklahoma, 49 Okl.Cr. 162, 292 P. 888.

█ Of course, the land mark case on this question was the California case of In re Whittington, 34 Cal.App. 344, 167 P. 404, wherein the court said:

"One is *not* a fugitive from justice from the state of Texas, so as to be subject to extradition thereto, where, having been arrested in that state for an offense there committed, he was with permission of its authorities taken in process under extradition to the state of California, there to answer to a charge of having committed a crime, though the later charge was later dismissed."

This Court prefers the language used in a later case adopting the Whittington case, Ex parte Drake, Cal.App., 233 P.2d 931. The Court said:

"A person in custody for an offense in one state may be surrendered to another state which requests his extradition, and such surrender operates as a waiver of jurisdiction of state over person of prisoner and prisoner cannot thereafter be considered a fugitive from justice from surrendering state so as to permit it to requisition him on termination of proceedings against him in second state."

Since there can be no doubt that the petitioner was removed from being a "fugitive from justice" by the surrender of the Texas Authorities, and based on all of the testimony, evidence, and the authorities cited above, the Writ of Habeas Corpus is accordingly Granted, and petitioner ordered released.

BUSSEY, P. J., and JOHNSON, J., concur.